*In re* MARRIAGE OF BARBARA HAGSHENAS, Petitioner-Appellant and Cross-Appellee, and BRUCE HAGSHENAS, Respondent-Appellee and Cross-Appellant.

Second District No. 2—91—0163

Opinion filed September 9, 1992.

John O. Demaret, of John O. Demaret & Associates, of Northbrook (Patricia A. Heeney, of counsel), for appellant.

Alex M. Abate, of Barrick, Switzer, Long, Balsley & Van Evera, of Rockford (Robert C. Pottinger, of counsel), for appellee.

JUSTICE UNVERZAGT delivered the opinion of the court which was modified on grant of respondent's petition for rehearing:

This is an appeal and a cross-appeal by Barbara and Bruce Hagshenas (hereafter Barbara and Bruce), from the property disposition judgment of the circuit court of Winnebago County entered pursuant to section 503 of the Illinois Marriage and Dissolution of Marriage Act (the Act) (Ill. Rev. Stat. 1989, ch. 40, par. 503) following the court's judgment of dissolution of the parties' 1974 marriage. Prior to the entry of the judgment of dissolution on July 13, 1990, the court found an irreconcilable breakdown of the marriage occurred as of June 1, 1987.

The parties owned substantial property, and, although they settled some of their differences as to the value and disposition of certain of the property, many other property disposition matters were submitted to trial held on various days over a three-month period.

The court's final judgment order entered on January 14, 1991, incorporated two prior memoranda of decision and a clarification letter. Although Bruce filed his notice of cross-appeal one day earlier than Barbara filed her notice of appeal, we find no jurisdictional problem is presented by this circumstance since both notices were filed within 30 days of the final judgment.

Barbara and Bruce each raise numerous issues which will be addressed below according to the property item at issue. Specifically, Barbara contends the court erred in (1) classifying the stock of Superior Travel as marital property; (2) valuing Superior Travel at $1,214,000; (3) finding Bruce dissipated only $160,141 of marital assets; (4) not awarding her interest on a promissory note from Bruce; (5) not valuing Bruce's Porsche; and (6) not equitably apportioning the appreciation in the Dean Witter account between the nonmarital and marital assets.

On cross-appeal, Bruce contends the court erred in (1) holding him solely responsible for any liability which may be imposed arising from the *Gaylord* litigation; (2) finding (a) that he dissipated marital assets or (b), alternatively, in calculating the amount dissipated and including certain items in the calculations; and (3) in not finding that one-half of the parties' interest in the property known as Shiloh is marital.

Preliminarily, we note that review of the record and issues presented is unduly hampered because none of the exhibits referred to as

record references in the parties' briefs were filed in this court. We note also that the 15 volumes of reports of proceedings are not chronologically numbered as required by Supreme Court Rule 324 (134 Ill. 2d R. 324), there are numerous misreferences to the record in the parties' briefs and an inordinate number of typographical errors both in the text and, quite confusingly, in the mathematical calculations. These defects are needless and annoying distractions to our review of the issues, and, ultimately, any uncertainty arising as a result of these defects is charged against the appellant or cross-appellant, as the case may be, who bears the burden of providing this court with a complete and correct record. *Teitelbaum v. Reliable Welding Co.* (1982), 106 Ill. App. 3d 651.

### SUPERIOR TRAVEL

The court found that Superior Travel, the parties' travel agency in Rockford, which was their major asset, was marital property: "It was conceived as the child of the marriage." Barbara contends the court erred in ruling that she did not own 62.5% of the stock in the agency as her own nonmarital property. The court's ruling was error, she asserts, because the evidence shows she purchased Fare-Way Travel, Inc., later renamed Superior Travel, with her own separate funds received from her mother and grandmother, and because it further shows that 250 of the 400 shares of Fare-Way Travel were agreed in 1982 to be issued to her and then were actually issued in 1986. The remaining 150 shares were issued to Bruce. Thus, she contends, the parties held respective interests in Superior Travel of 62.5% and 37.5%.

Bruce argues the court did not err in disposing of Superior Travel as marital property because it correctly concluded from the evidence that the parties considered Barbara's donations to Superior Travel to be loans to a marital venture rather than her nonmarital contribution for the purchase of a nonmarital venture. Further, Bruce notes it is incongruous that, despite Barbara's contention that Superior Travel is nonmarital property, she also agrees that 62.5% of the interest in Superior Travel is her nonmarital share and that 37.5% is Bruce's nonmarital share based on the issuance of stock certificates in 1986. Although Bruce acknowledges the issuance of such stock certificates, he asserts the court correctly found that no particular thought was given to the division of ownership in Superior Travel at the time it was being formed in 1982 except for the purpose of avoiding liability exposure in then-pending litigation.

Barbara worked as an administrative assistant for SwedishAmerican Hospital during the four years preceding her marriage to Bruce and for the next six years after they were married. From 1967 to the present, Bruce was an active insurance agent and proprietor of his own insurance business, Benefit Planning Services, Inc. (BPS, Inc.). In 1980, Bruce, along with Robert and Virginia Gaylord, who were close friends of Barbara's parents, became co-owners of a travel agency known as Imperial Travel, Ltd., a corporation. Bruce and the Gaylords each held 50% of the stock of Imperial Travel. Barbara and Bruce became officers and directors of Imperial; Barbara was a full-time employee of Imperial Travel and its secretary. Bruce was its primary salesman as well as vice-president/assistant secretary.

In 1982, Bruce became enmeshed in a dispute with the Gaylords concerning the management of Imperial Travel, and, in April, he filed a lawsuit to dissolve the corporation. (See *Hagshenas v. Gaylord* (1990), 199 Ill. App. 3d 60.) Bruce and Barbara resigned early in October 1982 as officers of Imperial Travel. Contemporaneously, Bruce and Barbara contacted an individual named Henninger for the purpose of purchasing an existing travel agency in Belvidere. They met with Henninger on Sunday, October 3, and agreed to purchase the stock of Fare-Way Travel, Inc., for $4,000, and its "hard assets" (office equipment, etc.) for $1,000. Fare-Way was acquired so that the couple could continue operating in the travel business after their resignation from Imperial.

The same day the couple met with Henninger, they met twice with Barbara's mother, Jeanne Marriott. They spoke with her about 11 o'clock in the morning, before they met with Henninger, and told her they were both "heartsick over having to resign from Imperial Travel and hopeful that [they] would be able to find this Mr. Henninger to see if the agency was for sale." They told her they would like to be involved in another travel agency and that the start-up funds that would be required would be excessive. They indicated that they could probably begin operations for about $20,000. The couple spoke with Barbara's mother later that same day after they met with Henninger.

On October 8, 1982, two checks made out to "cash" were deposited in Barbara's checking account at United Bank. One check for $7,500 was from Barbara's mother, and one check for $11,500 was from Barbara's grandmother, Alma Fairbairn. Prior to these deposits, Barbara's checking account had a balance of approximately $218.

Although the parties had joint accounts during the early years of their marriage, they had not had a joint account since 1978. The

United Bank checking account was in Barbara's name alone. Bruce was authorized to write checks on the account, although he testified he did not do so, and he deposited between $800 and $1,000 each month into this account. He referred to the account either as being "his" account or a "household" account. Barbara would frequently call Bruce's secretary and tell her to issue a check from BPS, Inc., which then would be deposited in the United Bank checking account. The checking account was used for everyday expenditures, and the deposits by Bruce were in whatever amounts Barbara said needed to be deposited. Barbara also maintained savings accounts, stock certificates, hospital bonds, and brokerage accounts in her own name. She pays by separate check her share of Federal income tax due on the income she derives from the investment of her nonmarital assets.

Barbara agreed that, in October 1982, Bruce had the ability to borrow money for the purchase of Fare-Way Travel. His annual income from BPS, Inc., at that time was between $100,000 and $200,000. The United Bank checking account was the fastest and easiest source of capital for Fare-Way Travel. Near the end of October, Fare-Way Travel was moved to Rockford, and Barbara received a check made out to her from her father in the amount of $7,500. This check was also deposited in the United Bank account and was then transferred to the Superior Travel, Inc., account, the new name Bruce and Barbara gave to Fare-Way Travel. Bruce and Barbara jointly established a $50,000 line of credit for Superior Travel in November 1982. Barbara testified that of the total $26,500 received from her family which was put into Superior Travel, all but about $5,000 had been repaid to her, and she believed that amount had not been repaid simply due to an accounting error.

There was evidence that in October 1982 Bruce and Barbara and Steve Sproul, the attorney who represented Bruce in the *Gaylord* litigation until he was disqualified from the case on conflict-of-interest grounds in August 1982, discussed Sproul having a 25% interest in the then-being-formed Superior Travel in lieu of payment to him for his work in the *Gaylord* case. Barbara and Bruce were to hold the remaining 75% of Superior Travel equally at 37.5% each. Barbara testified at trial she recalled the conversation with Sproul, but stated she did not agree to anyone else having an ownership interest in Superior Travel.

This three-way ownership plan apparently never actually took effect, although there was testimony concerning an exhibit purporting to be a stipulation presented in the *Gaylord* trial which stated that Sproul owned 25% of the stock of Superior Travel. That exhibit is not

included in the record here. Sproul testified he was "not sure" he ever paid the $1,000 which was discussed as payment for his 25% ownership, and he stated he did not take any shares in 1982. Bruce also testified it presently was not his position that Sproul owned 25% of Superior Travel; rather, Barbara and he himself owned it "50/50."

Barbara stated that "one big reason" for the 250/150 share split in Superior Travel was because of the *Gaylord* litigation; she did not want anything in a "50/50 situation" after what happened with that. Further, in light of the *Gaylord* litigation, where there was a possibility of an issue being raised that Bruce's acquisition of Fare-Way Travel was a usurpation of a corporate opportunity, and, in view of Barbara's parents' close friendship with the Gaylords and, thus, her presumed immunity from the suit, it was felt Barbara should be represented as being the majority shareholder in Superior Travel. As noted above, stock certificates which actually were issued during an IRS audit in 1986 showed Barbara owning 62.5% of the stock and Bruce owning 37.5% of the stock.

We are not persuaded by Barbara's argument that the court erred in finding Superior Travel to be marital property. It is clear that, before the court may dispose of property upon a dissolution of marriage, it must classify the property as either marital or nonmarital (*In re Marriage of Durante* (1990), 201 Ill. App. 3d 376), and its classification will not be disturbed unless it is contrary to the manifest weight of the evidence (*In re Marriage of Rosen* (1984), 126 Ill. App. 3d 766). After classification, each spouse's nonmarital property is given to that spouse, and the marital property is divided in just proportions. (Ill. Rev. Stat. 1989, ch. 40, par. 503(d).) There is a rebuttable presumption that all property acquired by either spouse after marriage and before dissolution is marital property regardless of how title is held. (Ill. Rev. Stat. 1989, ch. 40, par. 503(b).) The presumption is rebutted by a showing that the property was acquired by a method listed in subsection (a) of section 503. (Ill. Rev. Stat. 1989, ch. 40, par. 503(b); *In re Marriage of Landfield* (1991), 209 Ill. App. 3d 678, 688.) One such method is to show that the property acquired after marriage was "acquired in exchange for property acquired by gift, legacy or descent." Ill. Rev. Stat. 1989, ch. 40, par. 503(a)(2).

There is another presumption that a transfer from a parent to a child is presumed to be a gift, and that presumption may be overcome by clear and convincing evidence to the contrary. (*In re Marriage of Agazim* (1986), 147 Ill. App. 3d 646, 648; *In re Marriage of Weinstein* (1984), 128 Ill. App. 3d 234, 247; *In re Marriage of Rosen* (1984), 126 Ill. App. 3d 766, 772.) In cases where a determination of the nature of

the property at issue was found to be subject to these conflicting presumptions, the presumptions are considered to cancel each other out, and a simple manifest weight of the evidence standard is applied. (See *In re Marriage of Hunter* (1992), 223 Ill. App. 3d 947, 952; *In re Marriage of Agazim*, 147 Ill. App. 3d at 648; *In re Marriage of Rosen*, 126 Ill. App. 3d at 772-73.) That is, the presumption of a gift to a child is canceled out by the conflicting presumption that all property acquired after marriage is marital property, and, thus, the trial court is free to determine the issue of whether the asset in question was marital or nonmarital property without resort to the presumption. *In re Marriage of Landfield*, 209 Ill. App. 3d at 696.

Asserting that assets purchased with separate funds remain separate property regardless of the number of post-marital exchanges as long as there is no positive evidence to make a gift (*In re Marriage of Preston* (1980), 81 Ill. App. 3d 672), Barbara contends she rebutted the presumption of a gift to the marital estate which arose from her contribution of the initial funds to purchase Fare-Way. She contends the same factors found in *In re Marriage of Guerra* (1987), 153 Ill. App. 3d 550, which rebutted the presumption of a gift there are present in this case as well and the court erred in not applying those factors to reach the same result here. The gift principles applied for purposes of determining rights to reimbursement under section 503(c) for contributions of nonmarital property to property acquired jointly by spouses as in *Guerra* also apply for purposes of classifying jointly held property as marital or nonmarital. Ill. Ann. Stat., ch. 40, par. 503, Supplement to Historical & Practice Notes, at 64 (Smith-Hurd Supp. 1991).

In *Guerra*, the husband appealed the court's finding that certain property purchased by him during the marriage was marital property because it was purchased through so-called "blue" accounts which had his wife's name on them as a joint tenant. The parties there stipulated that the husband used and controlled the "blue" accounts and the wife used and controlled the "pink" accounts. Both parties' names were on all of the accounts. During the marriage, the husband sold the stock in the company he had founded prior to the marriage, EAMC, and sale proceeds in the form of installment payments to him were deposited into his "blue" account so that he would have a place to put them in order to write checks to make purchases of other nonmarital assets in exchange for those nonmarital sale proceeds.

The trial court found that of the almost $2 million in proceeds from the sale of EAMC, 44% was "tainted," the tainted assets being those purchased by the husband in his name alone but which were

purchased through the "blue" accounts which had the wife's name on them as a joint tenant.

On review, this court reversed. We agreed that the tainted property was acquired in exchange for the husband's nonmarital company stock. Noting the fact that the funds for the assets had been dispersed through a joint checking account of the parties causing a commingling of marital and nonmarital property, we proceeded to consider the effect of such commingling. Section 503(c)(1) of the Act provides that when marital and nonmarital property is commingled, the commingled property is transmuted into marital property, and, pursuant to subsection (c)(2), the party contributing the transmuted nonmarital property is entitled to reimbursement of the value of such property provided (1) the contribution is traceable by clear and convincing evidence, and (2) the contributor did not make a gift of the nonmarital property to the marital estate. See Ill. Rev. Stat. 1989, ch. 40, pars. 503(c)(1), (c)(2); *In re Marriage of Guntren* (1986), 141 Ill. App. 3d 1, 6.

We concluded in *Guerra* that the husband was entitled to reimbursement for the value of the property where the traceability of the contribution was established and the evidence rebutting the presumption of a gift to the marital estate was clear, convincing and unmistakable. Some of the factors we considered significant in determining whether the presumption of a gift had been rebutted or shown to be unreasonable were (1) the size of the gift relative to the entire estate; (2) who paid the purchase price, made improvements, and paid taxes for the property with solely acquired funds and exercised control and management over the property; (3) when the asset was purchased; and (4) how the parties handled their prior financial dealings with each other.

We viewed the joint account in *Guerra* as "merely a conduit" through which the husband dispersed his nonmarital assets and that "[i]t is [the alleged donor's] intention at the time the property is converted into property held by them as joint tenants which is controlling *vis-a-vis* the status of the property. [Citation.] Were it otherwise, it would be incredibly difficult for any party to rebut the marital presumption of gift where property has been exchanged via any joint tenancy account." *In re Marriage of Guerra*, 153 Ill. App. 3d at 559.

Applying those factors in the instant cause, Barbara concludes the presumption of a gift has been rebutted where a total of only $5,000 was expended to purchase Fare-Way Travel and its hard assets; she furnished the funds for the purchase and was CEO of Superior Travel whereas Bruce was the main salesman; she and Bruce handled their

finances separately except for a short period of time early in their marriage when they had a joint checking account; Bruce's name was not on her savings account, stock certificates, hospital bonds or brokerage accounts and Bruce required her to pay by separate check her share of Federal income tax due on income she received from investment of her nonmarital assets. The only factor she concedes was in Bruce's favor was that the purchase of Fare-Way Travel occurred during their marriage.

Applying the same factors, we find the evidence also supports a contrary finding, and, as such, we do not find that the court's judgment was against the manifest weight of the evidence. With *Guerra* as our guide, we view the relatively small size of the alleged $5,000 gift here actually as a factor which supports a finding that it was a gift to the marital estate. The larger the gift in relation to the size of the entire estate, the less likely it is it was intended to be a gift. We did not feel it reasonable to presume that the husband in *Guerra* intended to gift 44% of his estate to his wife, who was his fourth marriage partner.

In contrast here, the evidence shows both parties were deeply involved in the operation of Imperial Travel before that operation began to unravel and that they wanted to continue in the travel business as quickly as possible in order to continue servicing whatever accounts they could maintain. Also, they were jointly involved in negotiating the purchase of Fare-Way Travel and jointly met with Barbara's mother to indicate their desire to acquire and start-up an agency, the cost of which they estimated to be about $20,000. Subsequently, the placement of the funds received from Barbara's family in Barbara's checking account not only was considered by the parties to be the most expeditious way to hold and then disperse them, but also was consistent with the parties' practice of using that account as a conduit for the payment of marital expenses despite the fact it technically was not a "joint account."

After acquiring Fare-Way Travel, the parties jointly obtained a $50,000 line of credit for setting up the new agency which they renamed, relocated and actively, jointly operated without strict observance of corporate formalities. Further, the fact that Barbara made loans of personal funds to Superior Travel during its early months of operation which would and could have been paid back completely except for an accounting error, considered along with her assertion that the funds used to purchase Superior Travel were not repaid at any time and are still carried on Superior Travel's books as "invested capital," further suggests a gift of the capital was intended where she

otherwise was repaid for personal loans made to Superior Travel. Property designated as nonmarital pursuant to exceptions in the Act may still be presumptively transmuted into marital property by the affirmative act of the contributing spouse. *In re Marriage of Riech* (1991), 208 Ill. App. 3d 301.

We conclude the court did not err in its judgment that Superior Travel was marital property. There were numerous reasons advanced at trial in explanation of the 67.5/32.5 stock split, primarily relating to the *Hagshenas v. Gaylord* litigation. The court found, and we agree, that, except for that litigation, the manifest weight of the evidence shows the parties gave no particular thought to a division of ownership in Superior Travel at the time it was formed and the parties intended to own it as a marital asset.

### VALUE OF SUPERIOR TRAVEL

On March 8, 1990, during the course of the trial, the parties stipulated that Bruce would resign as an officer of Superior Travel and would give Barbara all of his interest in it. It was further stipulated that the trial court would determine the value of Superior Travel within the limits of $1 million and $1,380,000. The court found the value of Superior Travel was $1,214,000, apparently including in that amount Superior Travel's goodwill and hard assets, cash on hand and accounts receivable.

Barbara contends the court abused its discretion in not accepting her expert's opinion that the value of the business would be diminished without a noncompete clause. Further, she contends that it was error for the court to include the gross, as opposed to net, accounts receivable in tallying Superior Travel's value inasmuch as she testified that half of those accounts were 90 days overdue and not all of them would be collected. If the net rather than gross accounts receivable had been factored in, Barbara asserts that the correct value of Superior Travel would be approximately $1 million.

Bruce argues in response that the court was not obligated to accept Barbara's expert's testimony and that its valuation of Superior Travel was proper where Barbara presented no evidence of uncollectibility of the accounts receivable and where the evidence showed that the court's valuation could even have been higher.

Barbara called Patrick Foster as her expert witness on the value of Superior Travel. Foster is a CPA who has been in the business of accounting for travel agencies for 14 years. He has brokered travel agencies and has evaluated many travel agencies. Foster testified that, in his opinion, the value of Superior Travel as of October 31,

1989, was $625,000. That figure did not include accounts receivable or cash and assumed a noncompete clause in the sale. Foster testified he had never been involved in the sale of a travel agency that did not include a noncompete clause. Foster believed that the value of the agency would be reduced if it did not contain a noncompete clause due to the goodwill which is built into the business by the owner. He stated that a large part of what a travel agency sells for is the goodwill that agency operators build up with their customers. He was unable to quantify the reduction in value that would occur without a noncompete clause; he would advise a potential buyer "to walk away" from a sale which did not include a noncompete clause.

In February, early in the trial, Barbara testified her opinion of the value of Superior Travel, which she based on the opinion of her expert, was $625,000, assuming the inclusion of a noncompete clause, but not including cash and accounts receivable. She also testified at that time that she was concerned that competition from Bruce could negatively affect the value of Superior Travel by 25% to 30%.

In later proceedings in April, after the parties had stipulated that Barbara would be given the business, and at a time when Barbara knew Bruce *would* be competing with her in the travel business, she testified again that the value of Superior Travel was $625,000 not including approximately $300,000 in cash and $289,000 in gross accounts receivable. She estimated net accounts receivable were $100,000 and that about half of the gross accounts receivable were more than 90 days old and their collectibility was in question. Over and above the $625,000 value, plus the cash and gross accounts receivable, would be anything due to be received in the nature of hotel and car commissions (which average $10,000 to $15,000 per month and are two to three months behind in being received), override commissions from the airlines (not as much as $100,000 per month but as much as $50,000 per month) and a $50,000 two-year past-due credit owed by Intrabrokers.

Bruce testified that, to him, the value of Superior Travel would be between $1.5 and $2 million because of his special interest in and his knowledge of its potential. Sold to a third party with the cooperation of both himself and Barbara, his opinion was that the value of Superior Travel would be $1.4 million. That figure included goodwill, assets (including net accounts receivable) and commissions earned but not paid. He testified there is a lag of 4½ months in receipt of airline override commissions which average about $24,000 per month, and there are other override commissions that are due to the agency from other clients in the travel industry.

■ The valuation of the marital property of the parties, which is to be valued as of the date of the judgment dissolving the marriage of the parties (July 13, 1990, here) (*In re Marriage of Morrical* (1991), 216 Ill. App. 3d 643; *In re Marriage of Pittman* (1991), 212 Ill. App. 3d 99; *In re Marriage of Rubenstein* (1986), 145 Ill. App. 3d 31, 35), and on the basis of what a willing purchaser will pay to a willing seller in a voluntary transaction (*In re Marriage of Melnick* (1984), 127 Ill. App. 3d 102, 108), is a matter within the discretion of the trial court, which will not be overturned absent an abuse of that discretion, that is, where no reasonable person would take the view adopted by the trial court. (*Morrical,* 216 Ill. App. 3d at 645; *In re Marriage of Bush* (1991), 209 Ill. App. 3d 671.) "To determine the value of a business which is marital property, the court must consider (1) fixed assets, (2) other assets, including accounts receivable, (3) the goodwill in the business, and (4) business-related liabilities." *In re Marriage of Feldman* (1990), 199 Ill. App. 3d 1002, 1004.

■ Given the range of values presented to the court, we cannot conclude that a reasonable person could not have arrived at the same figure and, therefore, find no abuse of the court's discretion.

As to the issue of whether the absence .of a noncompete clause would reduce the value of the agency, Barbara's expert witness was unable to place a dollar value on such a reduction in value, nor did he testify as to the value of Superior Travel if cash on hand and accounts receivable were included. Barbara's testimony that the value of the business would be reduced by 25% to 30%, the basis for which opinion was unexplored at trial, was undercut by her subsequent testimony, after it was clear that Bruce *would* be competing with Superior Travel, that her opinion of the value of the business was that it was worth $625,000. The court also heard Bruce's opinion that Superior Travel was worth $1.4 million to a third-party buyer, assuming he and Barbara would cooperate and not compete. There also was evidence that Bruce had extended offers to Barbara to buy her one-half interest in Superior Travel for amounts of $690,000 and $750,000 without a noncompete clause.

It was uniquely within the court's province as the trier of fact to resolve the conflict in the value evidence given by the three "experts," Barbara, Bruce and Barbara's expert, and, in view of the paucity of a factual or quantifiable basis for Barbara's and her expert's opinions that the absence of a noncompete clause would reduce the value of the business, we find the court did not abuse its discretion in disregarding—as it apparently did—their opinions on this point and relying instead on the other evidence of value presented. *Cf. In re Mar-*

*riage of Harding* (1989), 189 Ill. App. 3d 663, 675 (court did not abuse its discretion in disregarding expert's testimony on value of stamp collection where it otherwise utilized purchase price as measure of value).

We also find the court did not abuse its discretion in apparently including in its valuation calculation the gross, rather than net, accounts receivable. Barbara first estimated her net accounts receivable as $100,000 but later stated she felt that may have been "high," and she indicated her staff was reviewing the files to achieve a more accurate figure. She did not ever produce this more accurate figure, however, and she should not be allowed to benefit on review here from her failure to introduce this evidence. (*In re Marriage of Smith* (1983), 114 Ill. App. 3d 47, 54.) Assuming, *arguendo*, the court should then have accepted her "high" estimate of $100,000 for lack of any better evidence, and despite the fact the court seemed originally to have discounted this additional evidence, a reasonable person could nonetheless have adopted the court's view that Superior Travel's value was $1,214,000 in light of the three to four months' past-due average airline override and hotel and car commissions and the $50,000 past-due Intrabrokers' commission, all of which amounts were over and above the value of Superior Travel's goodwill, cash and accounts receivable.

### DISSIPATION

Both parties appeal the court's finding that Bruce dissipated $160,141 of marital assets. That figure was calculated as follows for the period June 1, 1987 (date of the irreconcilable breakdown of the marriage), through December 31, 1989: total disposable income available to Bruce: $518,121 ($456,346 stipulated to by Bruce plus $61,775 income from "unrelated source" in second half of 1987 = $518,121) *less* $376,980 (comprised of these amounts: $65,480 for Bruce's clothing, insurance, electric, telephone, and food and $311,500 for Bruce's $150,000 loan to his brother, $23,000 Porsche payments, $700 Dean-Witter account balance, $125,000 loss on Integrated Resources investment, $11,000 advance to Illinois Video and $1,800 Florida condo expenses), *plus* $19,000 (income tax refund check) equals $160,141 in dissipation.

Barbara contends the court should have found that Bruce dissipated a total of $381,816 where there was no allotment for her contribution to the marital estate *vis-a-vis* Bruce's dissipation of the marital estate, where no evidentiary documents supported Bruce's purported expenditures of over $200,000 for marital expenses and where a total

of $154,000 was invested in speculative and risky ventures after the petition for dissolution had been filed. In his cross-appeal, Bruce contends the court erred (1) in finding any dissipation of marital funds occurred where the purported dissipation following the irreconcilable breakdown of the marriage was merely a continuation of a spending pattern established during the marriage; (2) in computing his income and expenditures; and (3) in substituting its own values for the unrebutted testimony given by him at trial concerning living expenses.

■ In its division of marital property in just proportions, the court must, *inter alia*, consider the contribution or dissipation of each party in the acquisition, preservation or depreciation or appreciation in value of the marital and nonmarital property. (Ill. Rev. Stat. 1989, ch. 40, par. 503(d)(1).) A trial court's allocation of marital property, including making allowances for dissipation, will not be reversed absent an abuse of discretion. Such discretion will be considered abused only when no reasonable man would agree with the decision reached by the trial court. (*In re Marriage of Morrical* (1991), 216 Ill. App. 3d 643, 645; *In re Marriage of Pittman* (1991), 212 Ill. App. 3d 99, 101; *In re Marriage of Smith* (1984), 128 Ill. App. 3d 1017, 1019.) In its legal sense, dissipation is defined as the use of marital property for the sole, but not necessarily personal (*In re Marriage of Jones* (1989), 187 Ill. App. 3d 206, 233; *In re Marriage of Petrovich* (1987), 154 Ill. App. 3d 881, 886), benefit of one of the spouses for a purpose unrelated to the marriage at a time when the marriage is undergoing an irreconcilable breakdown (*In re Marriage of O'Neill* (1990), 138 Ill. 2d 487, 497; *Morrical*, 216 Ill. App. 3d at 646; *In re Marriage of Makar* (1991), 211 Ill. App. 3d 692). A party charged with dissipating marital assets is obliged to establish how those funds were spent by clear and specific evidence (*In re Marriage of Bush* (1991), 209 Ill. App. 3d 671; *In re Marriage of Partyka* (1987), 158 Ill. App. 3d 545); general and vague statements that the funds were spent on marital expenses or to pay bills will not suffice to avoid a finding of dissipation. *In re Marriage of Radae* (1991), 208 Ill. App. 3d 1027, 1031; *In re Marriage of Smith* (1984), 128 Ill. App. 3d 1017, 1022.

■ We will deal first with the dissipation issues raised by Barbara. In so doing, we acknowledge, and the parties do not dispute, that Barbara and Bruce subscribed to different philosophies of life: Barbara tended to be frugal and conserved assets whereas Bruce tended to be indulgent with himself and others and dispersed assets. As we understand her initial argument, she contends the court failed to make an allotment for this lifestyle difference in its distribution of marital property. She hints that checks Bruce wrote to gambling casi-

nos should have been included as dissipation, but those amounts ($116,200 in 1988 and $29,010 in 1989) do not appear to be included in her calculations whereby she urges us to find that Bruce dissipated a total of $381,816. Those amounts were not apparent either in the court's property distribution, but it is clear the court agreed that Barbara objected to Bruce's gambling even before the marriage broke down. Consequently, we do not understand how her argument pertains to the relief requested or that she was prejudiced by the court's judgment in this regard. Although gambling could constitute dissipation (see *Morrical,* 216 Ill. App. 3d at 646; *In re Marriage of Smith* (1983), 114 Ill. App. 3d 47, 51 (trip to Las Vegas)), Bruce's testimony at trial shows the checks written to the casinos did not represent losses, but served to establish credit with the casinos which, in turn, would provide complimentary lodging, food, beverages and shows for Bruce and/or clients he was entertaining.

We find no merit in Bruce's related argument on cross-appeal, however, that the court erred in finding dissipation as a matter of law since his casino patronage was merely a continuation of the pattern established before the breakdown of the marriage. The issue is not whether the spending is consistent with that engaged in prior to the breakdown but, rather, whether such spending was for the sole benefit of one of the spouses for a purpose unrelated to the marriage at a time when the marriage is undergoing an irreconcilable breakdown.

Bruce claims that *In re Marriage of Adams* (1989), 183 Ill. App. 3d 296, is analogous because it was held there that no dissipation had occurred where the husband's expenditure of marital funds on cigarettes, beer and tips after the breakdown of the marriage was merely a continuation of a pattern which existed during the marriage. The fact there was a consistent pattern before and after the marital breakdown was not the dispositive point, however. The trial court's finding that there was no dissipation of marital assets was appealed by the wife, who alleged that over $16,000 of the husband's net income was unaccounted for. In upholding the trial court's finding of no dissipation, these factors were relied upon: (1) there was no clear indication of exactly when the marital breakdown occurred; (2) the wife's claims of dissipation were not limited to any time period; (3) there was no evidence the wife objected to, as opposed to not agreeing with, the husband's frequent journeys to taverns; and (4) a total of only $4,986 to $6,086 of the husband's net income of $50,040 over the entire two-year, four-month duration of the marriage was unaccounted for as a marital expenditure (the husband testifying "Well, there's cigarettes, beer, tips"). Similarly, in *In re Marriage of Aud*

(1986), 142 Ill. App. 3d 320, no improper dissipation of marital funds was found in the expenditure of almost $70,000 of marital funds for the case of the husband's mother. Approximately this same amount was spent in years prior to the marital breakdown by the husband who was the mother's only living descendant, and the wife raised no objection when those payments were being made.

The amounts of the checks written to casinos here are not insignificant, and the court found Barbara objected to Bruce's gambling even before the breakdown of the marriage. Accordingly, we find no error in the court's judgment that dissipation occurred. However, in light of Bruce's testimony which suggests that at least some of the gambling activity was related to the entertainment of business clients, we find no abuse of the court's discretion in not making any specific allotment for this in its property distribution.

■ Barbara's next contention in regard to dissipation is that Bruce should be found to have dissipated $227,816 in marital income because he failed to produce documentary evidence to support his allegations that these funds were spent on marital purposes. She cites no authority which requires that documentary evidence must be offered in order that testimony will be found to be "clear and convincing." Testimony offered to explain or justify expenditures charged as dissipation must, at a minimum, be offered by the spouse charged with dissipation. (See *Petrovich*, 154 Ill. App. 3d at 887; see also *Smith*, 128 Ill. App. 3d at 1021.) The explanation given then requires that the trial court determine the spouse's credibility as to whether these expenditures were for a purpose related to the marriage. (*In re Marriage of Adams* (1989), 183 Ill. App. 3d 296, 301.) The court's determination of credibility will not be disturbed unless it is manifestly against the weight of the evidence. *In re Marriage of Getautas* (1989), 189 Ill. App. 3d 148, 155-56.

Unlike the insufficient vague, general testimony received in *Partyka* (respondent testified that he spent $5,000 "to live on and pay the bills" and spent $3,500 "to keep the marital home going"), Bruce testified in specific detail as to his expenses for rent, food, clothes and utilities after the breakdown of the marriage. He also testified that most, if not all, of these payments were made in cash. Based on Bruce's testimony, and reducing certain of the amounts, the trial court here found Bruce's living expenses to be $65,480. Since Bruce had "accounted" for that amount, the court excluded that from the amount it otherwise found to have been dissipated.

In our original opinion, we determined that, because these expenses were not shown as being related to the marriage, however, the

court should have included the sum of these living expenses in the total amount dissipated. In his petition for rehearing, which we granted, Bruce asserted it was error for us to have found that his living expenses constituted dissipation. He argues it is "incomprehensible" to hold that expenditures relating to the basic necessities of life such as clothing, insurance, electricity, telephone, and food can be considered a dissipation of marital assets. In reaching the conclusion that Bruce's $65,480 in living expenses constituted a dissipation of marital assets, and, mindful of the legal definition of "dissipation"—that is, the use of marital property for the sole benefit of one of the spouses for a purpose unrelated to the marriage at a time when the marriage is undergoing an irreconcilable breakdown (*In re Marriage of O'Neill* (1990), 138 Ill. 2d 487, 497; *In re Marriage of Morrical* (1991), 216 Ill. App. 3d 643, 646)—we found support for our conclusion in cases in which the court found marital funds to have been dissipated where they were used to secure housing after leaving the marital home (*In re Marriage of Harding* (1989), 189 Ill. App. 3d 663, 678) or to purchase household appliances and furnishings for apartments maintained after the spouse moved out of the marital residence (*In re Marriage of Partyka* (1987), 158 Ill. App. 3d 545, 552; *In re Marriage of Smith* (1983), 114 Ill. App. 3d 47, 51).

We now agree with Bruce that *Smith*, *Partyka*, and *Harding* are distinguishable and that the expenditure of marital funds by one spouse for necessary, appropriate and legitimate living expenses at a time when the marriage is undergoing an irreconcilable breakdown will not be considered to be dissipation. (See *In re Marriage of Seversen* (1992), 228 Ill. App. 3d 820, 823-28 (and cases cited therein).) We do not agree, however, that it is "incomprehensible" that expenditures for basic living expenses could be considered a dissipation of marital assets. It is entirely within the realm of possibility that one spouse's use of marital funds for his or her own living expenses at a time when the marriage is undergoing an irreconcilable breakdown could be shown to be so selfish and excessive and improper as to constitute an outright waste of marital funds. (See *In re Marriage of Landwehr* (1992), 225 Ill. App. 3d 149, 151 ("dissipation involves one spouse's use of marital property for a selfish purpose unrelated to the marriage at a time when the marriage is undergoing an irretrievable breakdown"); *In re Marriage of O'Neill* (1990), 138 Ill. 2d 487, 495 ("the term 'dissipation' [has been interpreted] as pertaining only to the improper use of marital assets after a marriage has begun an irreconcilable breakdown"); *In re Marriage of Getautas* (1989), 189 Ill. App. 3d 148, 155 (" 'Dissipate' means '[t]o destroy or waste, as to ex-

pend funds foolishly' ").) Some of Bruce's living expenses here arguably were excessive, selfish, improper or not proved. The trial court, after considering these expenditures, however, either disallowed or reduced the amounts claimed by Bruce, such as those for rent and housekeeper and support for his mother (all disallowed), and those for food, clothing, insurance, and utilities (all reduced).

Because the trial court conscientiously considered these various expenditures, we find the court did not abuse its discretion in concluding that $160,141 of marital funds was dissipated by Bruce.

■■ Barbara next contends that the court should have found Bruce also dissipated the $125,000 he invested in 300 shares of Intrabrokers and the $11,000 he loaned to Illinois Video, a corporation purchased by the parties during the marriage. Because Barbara cites no authority in support of her argument, we consider it waived. Despite the fact these funds were invested and loaned after the petition for dissolution was filed, there was no evidence of an intent to dissipate the funds invested (*cf. In re Marriage of Drummond* (1987), 156 Ill. App. 3d 672, 683-84 (husband involved in commodity trading prior to and during marriage did not dissipate funds invested in the hope of obtaining a profit)), and Bruce testified the loan to Illinois Video was made so that it could pay its bills. Consequently, we find no abuse of the court's discretion in not including these amounts in its finding of dissipation.

■■ Bruce's further contention on cross-appeal is that the court erred in its calculation of his disposable income by adding a figure of $61,755 twice and including therein two loans which were shown as income on his 1988 tax return.

We disagree that the court twice added the $61,755 figure. Its memorandum of decision twice refers to this $61,755 (which was half of the bonus received by Barbara from Superior Travel in the second half of 1987), but the court's final figure of $518,121 of disposable income was arrived at by adding the $61,755 for 1987 to Bruce's stipulated net income of $456,346.65 received in 1987, 1988 and 1989. According to the testimony received by the court on May 30, 1990, that net stipulated amount did not otherwise include the $61,755 received in the second half of 1987, as was previously testified to on May 22, 1990. Rather, the testimony on May 30 as to Bruce's disposable income for the second half of 1987 included $10,674.65 in his Dean Witter account, $4,700 in his checking account, and $2,000 from BPS. Adding those amounts to his after-taxes net cash of $359,000 in 1988 and $79,972 in 1989, the stipulated amount of Bruce's disposable income from June 1, 1987, to December 31, 1989, was calculated to be

$456,346.65. That amount, however, did not include the receipt of the $61,775 amount from Superior Travel in the second half of 1987 which previously was testified to on May 22. Accordingly, it was not error for the court to add that amount to the amount Bruce stipulated to in order to arrive at its conclusion that Bruce had $518,121 in disposable income to account for in order to avoid a finding that he dissipated that amount.

As to the $75,000 and $45,000 loans shown as income on his 1988 tax return, Bruce points to nothing in the record which indicates the court added either or any of the amounts to the net income stipulated to by him at trial or that it referred to that tax return, and we see no error in this regard.

■■ Bruce's final contention with regard to dissipation is that the court abused its discretion in substituting its own values for the unrebutted evidence of living expenses he presented at trial. The only specific record-reference-supported complaint he makes is that the court did not give him credit for the $750 per month he paid for the rental of his apartment. The court did not credit him with this amount because it did not appear to the court that that amount had actually been paid to Imperial Investment Management Company, a property he and Barbara owned. Bruce testified that his account at Imperial Investment would be debited for the amount of the rent and, before the year's end, he would write a check. We see no abuse of the court's discretion in not "crediting" Bruce with the rental amount.

■■ Barbara's next contention is that she should be awarded the 17% interest stated on the face of the 1981 $25,000 promissory note from Bruce which the court credited to her and which original note was introduced into evidence. We have not located any reference in the record to the 17% rate of interest shown on the face of the note, and we have not been provided with any of the exhibits admitted at trial. Consequently, we have only Barbara's unsupported assertion in her brief that this interest is due, and, as such, we cannot consider the issue. (*In re Marriage of Wright* (1991), 212 Ill. App. 3d 392, 394; *In re Estate of Friedman* (1984), 123 Ill. App. 3d 82.) We find no merit in Bruce's related assertion that he paid this note. A payor asserting payment as a defense to recovery on a promissory note has the burden of establishing by a preponderance of the evidence that the note was paid. (*Tuttle v. Rose* (1981), 102 Ill. App. 3d 865, 867; *Telpner v. Hogan* (1974), 17 Ill. App. 3d 152, 157-58.) Bruce testified Barbara loaned him $25,000 in 1981 but that the check was written for $30,000 because she owed him $5,000 on the Jackson Street townhome investment she made on her own. The couple also made an

investment jointly in one of the townhomes. Barbara testified she made two loans to Bruce. One in October 1980 was for $30,000, and in July 1981 she wrote him a check for $11,782.65 which was the second half of his down payment on their joint Jackson Street townhome investment. At the same time, she had him sign the $25,000 promissory note because he had not paid her back for the loan she made to him for the first half of the down payment.

The record shows Bruce made one interest payment to Barbara of $1,062 in 1981, and he testified he repaid the $25,000 loan in two installments: $21,800 in September or October 1981 and $3,500 before December 1981. Bruce had no copies of those checks, nor did he have anything to show the note was cancelled. Consequently, we conclude the court did not err in concluding that Bruce had not shown payment of the note by a preponderance of the evidence.

■■ As to Bruce's Porsche automobile, Barbara contends the court erred in not placing a specific value on it for purposes of distribution of the parties' personal property. Bruce testified he paid $23,000 in 1987 for the Porsche and he estimated its fair-market value was $11,400; Barbara testified its value was $25,000 based on the "book" value of the car. No other evidence of value was offered.

Barbara argues *In re Marriage of Greenberg* (1981), 102 Ill. App. 3d 938, is "on all fours" in that it was found there that the trial court should have made a finding as to the value of the parties' automobiles. *Greenberg* did not so hold, however. There, the husband testified he purchased his car for $9,000 and the wife purchased her car for $3,800. On review, the husband urged that the trial court failed to consider the value of the property set apart to each spouse with reference to household furniture, their automobiles, and his optometry business. There was no specific offer of proof regarding the furniture, and the court found the purchase price evidence of value of the automobiles was "sufficient" for the purposes of dividing the property.

Barbara does not argue whether or how she was prejudiced by the court's failure to place a specific value on the Porsche. Moreover, the Act does not require the court to place a specific value on each item of property in considering the value of the property to be set aside to each spouse. It requires only that there be sufficient evidence of value in the record to permit review of the court's distribution. (Ill. Ann. Stat., ch. 40, par. 503, Supplement to Historical & Practice Notes, at 78 (Smith-Hurd Supp. 1991); *cf. In re Marriage of Kundit* (1982), 107 Ill. App. 3d 310, 315 (where there was never evidence whatsoever of the value of the parties' household furnishings, life insurance policies or three automobiles, trial court's apportionment was without basis

for review and the cause was remanded).) In contrast, there was evidence here of the range in value of the Porsche, and we see no abuse of the court's discretion in not placing a specific value on it in dividing the parties' property in just proportion. The record shows only that the court considered the $23,000 for the Porsche to be nondissipated marital funds.

■■■ Barbara's final contention on appeal is that the court should have equitably apportioned the appreciation in the Dean Witter account between the nonmarital and marital assets. During her marriage to Bruce, Barbara consolidated her nonmarital assets which she had acquired prior to June 1, 1974. Her nonmarital securities and other assets were deposited into an E.F. Hutton brokerage account over a five-year period beginning in 1980. The E.F. Hutton account was titled solely in Barbara's name. In 1985, Barbara transferred the assets, totaling $23,794.46 from her E.F. Hutton account to the brokerage firm of Dean Witter.

The court found the balance in this account on May 3, 1990, was $363,000. Of that amount, it found Barbara could document that $114,235 came from her nonmarital funds. Marital assets, therefore, were found to make up the difference of $248,765 and any interest accumulated on the account was to be divided according to the percentage of nonmarital to marital assets. As near as we may determine from the record, marital deposits into the account were comprised of one deposit of $15,870.29 in 1986 and Superior Travel bonuses totaling $205,999.92 beginning in April 1988. Total marital deposits equalled $221,870.21.

Upon Barbara's motion for modification following the court's initial memorandum of decision, the court agreed with Barbara that the appreciation in the account should be equitably apportioned between the marital and nonmarital funds rather than all of the appreciation in the account being given to the marital estate. The court's memorandum of decision upon reconsideration stated it "will order that this appreciation be pro rated between the marital and nonmarital funds." In its final order, however, entered on January 14, 1991, the court provided:

> "The parties have marital property consisting of funds held in an account in [Barbara's] name at Dean Witter in Rockford, Illinois, which has an approximate balance of $363,000. [Bruce] is awarded as his sole and exclusive property the sum of $248,765 from said account and 34.25% of any funds in excess of $363,000."

Thus, Barbara asserts, the appreciation she received by virtue of the court's order was only a percentage (65.75) of the appreciation in the account since May 1990.

Under the Act, the increase in the value of Barbara's nonmarital funds in the account, irrespective of whether the increase results from a contribution of marital property, is nonmarital subject only to the right of reimbursement provided in subsection (c) of section 503. (Ill. Rev. Stat. 1989, ch. 40, pars. 503(a)(7), (c); *In re Marriage of Di Angelo* (1987), 159 Ill. App. 3d 293, 296.) Barbara asserts, with no supporting record references, that between December 31, 1988, and February 1990, the account grew by $35,373.74. She asserts further that, because 34% of the assets in the account were nonmarital, she should be awarded 34% of $35,373.74 in addition to the *pro rata* division of appreciation in the account since May 1990 which the trial court did award.

Bruce argues that Barbara did not present any evidence of the appreciation in the account, but she replies that she "used one investment account which appreciated by $35,373.74 since the last deposit in December 1988." Lacking a particular record reference which would support her assertion, and after numerous calculations with the known account contributions, deductions and balances, we have been unable to arrive at the amount of appreciation she claims occurred in the account. Presuming, however, that such an amount does have a proper basis in the record, and because it is apparent the court agreed with Barbara on this point but apparently inadvertently omitted to order that this appreciation be equitably apportioned in its final judgment, we believe Barbara should be given the opportunity to show that the $35,373.74 figure has a basis in the trial record. Accordingly, the cause is remanded. If that figure cannot be substantiated in the trial record, we find no error in the court's failure to apportion the alleged appreciation. If it can be ascertained, 34% of it is to be apportioned to Barbara upon remand and the trial court's judgment modified accordingly.

 Turning to the issues remaining in Bruce's cross-appeal, he first contends that the court erred in holding him solely responsible for any liability arising out of the *Hagshenas v. Gaylord* litigation (199 Ill. App. 3d 60). He argues the court abused its discretion in holding that he was entirely responsible for damages and attorney fees relating to the then-being-appealed lawsuit because (1) in order to distribute the parties' assets and liabilities in just proportions, there must be some evidence of the extent of same and (2) the liability created by the formation of Superior Travel should follow that asset. He

concludes the *Gaylord* liability should have been divided equally between himself and Barbara and that the court improperly considered that he could have filed a third-party action or counterclaim against Barbara in the *Gaylord* suit.

During the course of dissolution proceedings, Bruce and Barbara stipulated that the court would determine "whether or not the purchase price of Superior [Travel] [which Barbara was to pay to Bruce] shall be reduced for any liabilities which may be incurred as a result of any decision handed down in a case known as *Hagshenas v. Gaylord,* now pending in the Second District Appellate Court."

As referred to above, Bruce filed suit against the Gaylords to dissolve the corporation which he and they jointly owned, Imperial Travel. The Gaylords filed a counterclaim against Bruce, alleging breach of fiduciary duties and sought damages. The trial court denied Bruce's suit for dissolution and found in favor of the Gaylords on their complaint of breach of fiduciary duty. It found damages were too inexact to be determined, however, and granted equitable relief by ordering Bruce to forfeit his Imperial stock to Imperial and pay costs.

On review, we affirmed the finding of liability against Bruce but reversed and remanded the damage award where we found the evidence provided a reasonable basis upon which damages could be awarded. That evidence consisted of expert testimony offered as to the value of Imperial Travel on October 2, 1982, by the Gaylords ($438,100) and by Bruce (cash flow value of $80,300 and liquidated value of $101,000) and its value on February 28, 1983, after Bruce began competing with Imperial: between $50,000 and $70,000 (Gaylords' evidence) and $128,000 (Bruce's evidence—value *increased* because company paid off some significant debts). Notably, we rejected Bruce's contention that damage to Imperial could not be attributed to Superior where the evidence clearly showed Imperial lost most of its customers to Superior as a result of Imperial's sales people going to Superior. Because we decided there was an adequate remedy at law, we did not further consider the Gaylords' argument for a constructive trust on Superior's profits. *Gaylord,* 199 Ill. App. 3d at 78.

Our decision in *Gaylord,* filed June 27, 1990, was provided to the trial judge before its final judgment was entered here on January 14, 1991. Consequently, the court was aware that the range of damages in *Gaylord* was between $0 (as shown by Bruce's evidence) and $388,100 (as shown by the Gaylords' evidence). Further, we upheld the trial court's decision not to award attorney fees and punitive damages to the Gaylords.

In light of our opinion in *Gaylord*, we reject here Bruce's argument that the trial court had *no basis* on which to divide the marital property because it did not know the extent of liability which would be imposed. (See *In re Marriage of Mitchell* (1981), 103 Ill. App. 3d 242, 248 ("some evidence" of the value or liability attending each piece of property required in order to divide the property in just proportion).) Important also to the court's division of liabilities is the source of the debt, the party who signed the note for the debt and the overall circumstances of the parties. (See Ill. Ann. Stat., ch. 40, par. 503, Supplement to Historical & Practice Notes, at 80 (Smith-Hurd Supp. 1991).) The basis of the liability imposed in *Gaylord* was Bruce's breach of fiduciary duty; Barbara, although integrally involved in the operation of Imperial Travel, was neither a party to the lawsuit nor ·did she stand in any fiduciary relationship to the Gaylords. Accordingly, we find inapposite Bruce's argument that "a debt created by an asset should follow the asset." (*In re Marriage of Guntren* (1986), 141 Ill. App. 3d 1.) In *Guntren*, the court ordered the husband to pay a $7,405.54 loan which was made primarily to purchase farm equipment. That farm equipment had been assigned to the wife along with the marital estate, a 63½-acre farm. On review, the husband contended the wife should be required to satisfy the loan since she received the farm equipment. It was argued that the loan should follow the farm equipment and implements and be set off to the wife.

The liability incurred by Bruce in *Gaylord* was for breach of fiduciary duty both before and after he resigned as a director and officer of Imperial. After he resigned, he nonetheless retained a 50% ownership interest in Imperial Travel. As a 50% shareholder in that closely held corporation, we found he owed a fiduciary duty similar to that of a partner to Imperial Travel and it shareholders, the Gaylords. He violated that duty when he opened a competing business and hired away all of Imperial's employees. Similarly, we found he breached his fiduciary duty to the Gaylords even before he resigned from Imperial by various actions which were not related in any manner to the formation of Superior Travel.

Although we agree with Bruce that it would not have been logical or feasible for him to have joined Barbara in the *Gaylord* suit either as a third-party defendant or by filing an action for contribution against her, we review here only the court's judgment and not its reasons therefore. In light of Bruce and Barbara's stipulation that the trial court would decide whether to reduce the price Barbara was to pay Bruce for her purchase of Superior Travel in consideration of the

potential liability in the *Gaylord* litigation, we presume the court's allocation of the entirety of that liability to Bruce did not result in any reduction of the purchase price paid by Barbara. We conclude the court did not abuse its discretion in assigning all liability arising from *Gaylord* to Bruce.

 Bruce's last contention on cross-appeal is that one-half of the interest in the property known as Shiloh is marital. We disagree.

The trial court ruled that the property known as Shiloh was a nonmarital asset of Barbara's. Its fair-market value at the time of trial in 1990 was stated to be $161,500. The property was jointly purchased by the parties on a 10-year installment contract in 1978 for between $22,000 and $23,000. In 1980, Bruce wanted to invest in apartment buildings. A partnership was formed for the purpose of purchasing the apartment buildings and was known as Imperial Investments. In order to purchase the apartment buildings, Bruce and Barbara needed to pay $123,000.

At that time, the value of Shiloh had appreciated to $90,000. Accordingly, Bruce agreed to sell his undivided one-half interest in Shiloh (then worth $45,000) to Barbara in order to obtain a portion of the $61,500 he needed for his share of the investment in the Imperial partnership. Bruce contends here that he only sold his one-half interest in Shiloh to Barbara and that one-half of Shiloh still remained marital property.

In structuring the sale of Shiloh to Barbara, the parties entered into an exchange agreement in order to avoid the triggering of the capital gains tax. Under the terms of the agreement, Barbara purchased 106.5/150 of a beneficial interest in a land trust which held the Imperial Investments real estate. She then exchanged 45/150 of her interest in the trust for all of Bruce's interest in the land trust which held the Shiloh property. We have not been provided with a copy of the exchange agreement which was admitted at trial. According to the November 5, 1990, memorandum of decision, the court considered the agreement which it quoted in pertinent part as follows:

> " 'Bruce and Barbara have agreed to exchange Bruce's undivided 50% (fifty percent) beneficial interest in the equitable title to the real property described in Exhibit A for 45/150 of the beneficial interest in the equitable title to the real property described in Exhibit B in an exchange which gain or loss will not be recognized for Federal income tax purposes pursuant to Section 1.31 of the Internal Revenue Code.' "

Based on that wording, the court concluded the parties believed they each owned an undivided 50% interest in Shiloh and that the fur-

ther wording in the agreement that Bruce "transfer[red] and assign[ed] to Barbara all of his right, title and beneficial interest" in the Shiloh trust meant that Bruce was giving up all interest in the Shiloh property. We agree with the court's construction of this agreement. Bruce argues that he nonetheless should be reimbursed under section 503(c)(2) of the Act for the $45,000 contribution of his marital interest in Shiloh to Imperial Investments, which was marital property. Barbara testified, however, that she bought her 106.5/150 beneficial interest in Imperial Investments with nonmarital money. She then bought Bruce's interest in Shiloh in exchange for Imperial Investments. Thus, Bruce received a marital interest in Imperial Investments and gave up his interest in Shiloh. As Barbara notes, Bruce also received his proper share of Imperial Investments pursuant to the stipulation of the parties in which Bruce received certain property, including all the parties' interest and liabilities in Imperial Investments, along with appropriate credits due from Barbara.

For the reasons above, the judgment of the circuit court of Winnebago County is affirmed, and the cause is remanded for substantiation and reapportionment, if warranted, of the appreciation in the Dean Witter account consistent with this opinion.

Affirmed and remanded.

GEIGER and BOWMAN, JJ., concur.