2020 IL App (2d) 180851-U
No. 2-18-0851
Order filed April 20, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the Circuit Court |
| ANNA McMAHAN, f/k/a Anna Colandrea, | ) | of McHenry County. |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| and | ) | No. 13-DV-998 |
| | ) | |
| ZACHARY COLANDREA, | ) | Honorable |
| | ) | Michael E. Coppedge, |
| Respondent-Appellee. | ) | Judge, Presiding. |

PRESIDING JUSTICE BIRKETT delivered the judgment of the court.
Justices Schostok and Bridges concurred in the judgment.

**ORDER**

¶ 1   *Held*:  In determining the father's child support arrearage, the circuit erred in excluding from his net income the monies he obtained from his mother's trust because the funds were "loans" in name only.  Therefore, we affirmed as modified.

¶ 2   In this post-decree matter, petitioner, Anna McMahan, f/k/a Anna Colandrea, appeals from the circuit court's order setting child support arrearages owed by her by former husband, Zachary Colandrea, respondent.  Anna had filed a petition for rule to show cause stemming from Zachary's alleged failure to comply with a provision in their marital settlement agreement requiring him to pay as additional child support "32% of any net income received over and above $234,000 gross

income *** from any source whatsoever." Although Zachary was current with his base child support obligation, Anna alleged that he had received significant sums of money from his family but had not paid any additional child support on his net income that exceeded $234,000. After a hearing, Anna was awarded $121,504.64 in arrearages for the years 2015, 2016, and 2017. In ruling, the circuit court found that certain proceeds Zachary received from his mother's trust in 2016 and 2017 for which he executed promissory notes were loans and not income subject to the additional child support provision in the MSA. Anna contends that the circuit court's finding was in error because the proceeds are more accurately characterized as gifts and are thus "income." Assuming *arguendo* that the court did not err in finding that the proceeds were loans, she argues that the court should have nevertheless deemed the loans income for purposes of child support. We agree with Anna's first argument and affirm the judgment as modified.

¶ 3                          I. BACKGROUND

¶ 4     Zachary and Anna were married in 2001 and have three children together, namely: Gabriella, born in 2003, Alivia, born in 2005, and Adrian, born in 2007. Anna filed a petition for dissolution of marriage in 2013, and the marriage was dissolved on June 1, 2015. The judgment for dissolution of marriage incorporated a marital settlement agreement (MSA) and a parenting agreement. Anna was granted sole custody of the children and Zachary was provided visitation as established by the parenting agreement. Paragraph 13 of the MSA, which concerns child support, provides as follows:

> "Husband's net income from all sources is $7,812.50 (seven thousand eight hundred twelve dollars and fifty cents) per month. Husband shall pay thirty-two percent (32%) thereof, or $2,500 (two thousand five hundred dollars) * * * beginning on 7/1/2015 and [on] the 1st of each month thereafter. Husband shall also pay to Wife thirty-two (32%)

of any net income received over and above $234,000 gross income (two hundred thirty four thousand dollars) from any source whatsoever[,] including but not limited to bonuses, draws, salary, shareholder distributions, stock options, etc."

The MSA also provides that Zachary would pay Anna monthly maintenance of $5,900 for 79 months, but the parties agreed to terminate maintenance on September 12, 2018, retroactively to May 1, 2017, following Anna's cohabitation with her fiancé.

¶ 5    Anna filed a petition for rule to show cause on May 8, 2017, alleging that Zachary was receiving significant sums of money from his family but had failed to pay any additional child support required by the MSA.  Zachary replied on June 7, 2017, denying the material allegations therein.

¶ 6    On September 6 and 7, 2018, the circuit court conducted a hearing on Anna's petition for rule to show cause.  Anna voluntarily withdrew her request for a contempt finding prior to the commencement of the hearing, and she proceeded only on her request that Zachary be ordered to pay all child support arrearages she was due by a date certain.  We recount only the testimony that is relevant to the resolution of this appeal.

¶ 7    Zachary testified that when the dissolution judgment was entered on June 1, 2015, he was self-employed and operating three companies: Worldwide Trade Partners, LLC (Worldwide), Forward Motion, and Buy Local Book Shop.  None of the businesses were profitable, and he was not earning any income at the time of the dissolution.  Worldwide was a brokering company and, although Zachary earned approximately $500,000 from it 2013, the company stopped operating in July 2015 due to legal matters, and it dissolved in 2017.  Forward Motion was an education consulting company that collaborated with domestic companies in order to sell their products and service solutions to the international school market.  Forward Motion never made any money, and

it dissolved in August 2015. At the time of the hearing on Anna's petition for rule to show cause, Zachary was still operating Buy Local Book Shop, albeit at a loss, and he was attempting to sell the business. Buy Local Book Shop was last profitable in 2014. Zachary had not filed any income tax returns since 2014 because he had not earned any income since then.

¶ 8    Zachary acknowledged that the MSA required him to pay Anna base child support plus 32% of any income he received that exceeded $234,000. He was not earning any income when the marriage was dissolved, however. The $234,000 figure was based on his historical earnings from when he worked for Follett Corporation. There, he had earned $225,000 per year, plus bonuses. Zachary's employment at Follett ceased in 2013, and Follett was the last third-party employer he worked for.

¶ 9    Zachary testified that, from the entry of the judgment for dissolution of marriage through the date of the hearing, he supported himself exclusively with funds he borrowed from his mother, his father, and his mother's trust, of which he was a beneficiary. Various health matters impeded his ability to work, and he was hospitalized twice in 2016 for these matters. Without the funds he received from his family, he would have been unable to support himself, and he would not have been able to pay his maintenance and child support obligations required of him under the MSA. He was current in paying his base child support obligation of $7,812.50 per month. He "made the choice to borrow what [he] had to in order to make sure [he] was fulfilling [his] obligations."

¶ 10    Bearing in mind that his checking account statements were entered into evidence, Zachary testified that it would not surprise him to learn that, during the roughly 3-year period from June 1, 2015, through July 23, 2018, the deposits into his checking account totaled $1,584,113.58. Specifically, $291,567.97 was deposited between June 1, 2015, and the end of 2015; $707,403.85 was deposited therein in 2016; $465,571.18 was deposited in 2017; and, thus far, $119,570.58 had

been deposited in 2018. All the deposits came from his father, his mother, and his mother's trust. He also testified concerning cash withdrawals he made from his checking account during these same periods. He testified that it would not surprise him to learn that he made cash withdrawals of $49,228.55 in 2015, $108,872.45 in 2016, and $90,732.80 in 2017.

¶ 11    Zachary's uncle, Chuck Follett, served as the trustee of his mother's trust. Zachary and his two sisters were equal beneficiaries, and they each received a stipend of $3500 per month. Zachary did not have a copy of the declaration of trust. He did not know if his beneficial interest was expressed as a fixed dollar amount or a percentage, and he did not know what his remaining interest in the trust was. He identified at hearing a consolidated statement from Northern Trust Corporation from the first quarter of 2018 demonstrating that the value of the trust was $4,095,661.97. He had received other bank statements relative to the trust, but he did not produce them in discovery because he did not have them.

¶ 12    Zachary made numerous requests for funds from the trust when he needed money—both before and after the entry of the judgment for dissolution of marriage. His sisters had not received any funds from the trust in excess of their monthly stipend. To Zachary's knowledge, his uncle was authorized to make loans using trust funds, but he did not know what the trust provided in terms of what the loaned funds could be used for. He did not think the funds he borrowed could be used for whatever he wanted—he could spend the funds only "for bills, debts, making sure [he] was paying Anna the support [required by the MSA] *** as well as, you know, living while [he] was not working."

¶ 13    Whenever he sought funds from the trust, Zachary would make a written request to his uncle and Northern Trust documenting what the funds were to be used for and stating that the funds were a loan. However, there were times when he was not required to put anything in writing

regarding the purpose of the loan. He did not know what the funds were drawn from when his uncle made the various payments to him.

¶ 14    Zachary testified that he, at times, executed unsecured promissory notes to his mother concerning the funds he borrowed from the trust. At the request of his mother, Zachary and his uncle "handle[d]" the promissory notes because she was disabled and had no electronic devices available for her use. Zachary's exhibit No. 2 consisted of 12 promissory notes that were admitted into evidence. Zachary testified that he did not originally produce the notes in response to Anna's discovery requests in October 2017 because he did not think he was asked for them. He instead stressed that he "provided dollar amounts that were borrowed." He eventually produced the notes in August 2018 following an order for discovery sanctions.

¶ 15    We describe the promissory notes as follows. The total principal amount for the promissory notes was $710,244. They accrue interest at a rate of 3% *per annum* until paid in full. All the notes identify Zachary as the borrower and bear his signature, and all the notes identify Zachary's mother, Diana Mikos, as the lender. Neither Mikos nor Zachary's uncle signed any of the notes. The notes bear execution dates between August 2012 and July 2018. Eleven notes are payable to the trust, but the most recent note, bearing an execution date in July 2018, is payable to Mikos. Two notes preceded the judgment for dissolution of marriage and bear execution dates in August 2012 and January 2014; they total $110,244. Zachary testified that these funds were used to pay the parties' credit card debt. The remaining 10 notes bear execution dates after the entry of the dissolution of marriage. The total principal amount of these notes is $600,000, and they range in amount from $5000 to $200,000. Relevant to this appeal, five notes bear execution dates in 2016 and total $390,000, and four bear execution dates in 2017 and total $180,000. The final promissory note in Zachary's exhibit is in the amount of $30,000 and bears an execution date in

2018. All the notes, including those bearing execution dates during the parties' marriage, mature on December 31, 2021. Zachary testified that he did not know if this date was pertinent to any terms of the trust, but he believed the notes are due on this date in order to give him time to get his professional career going again. Zachary testified that if he is unable to repay the loans by the maturity date, he believed the loans will be restructured so that the maturity dates are extended.

¶ 16 Zachary testified about each note individually that he borrowed the specified amount on the date indicated, and that he signed the note either at that time or within a few days after the funds became available in his checking account. Relative to any notes he may have signed in the days after the funds became available, he dated them the date of the transfer to his account rather than the date he truly signed the notes. Accordingly, he could not state with certainty the exact date he executed any of the notes. After he signed each one, he sent his mother the original and retained a photocopy for his records.

¶ 17 His mother's trust also paid certain debt stemming from the sale of the parties' former marital residence in Lakewood, Illinois. Zachary lived there following the entry of the dissolution judgment, and the MSA required him to indemnify and hold Anna harmless concerning the obligations thereon. The residence was sold in May 2018, but the sale proceeds were insufficient to cover the debt. The settlement statement, which was entered into evidence, reflected funds due from Zachary of $118,632.46. Zachary testified that, at his request, his mother's trust paid these funds directly. He thought he remembered executing a promissory note for the $118,632.46, but he did not know where it was.

¶ 18 Zachary did not contemplate that the funds he obtained from his mother's trust could be considered income for purposes of child support, and at no time did he think that the money was gift or that the funds did not have to be repaid. To his knowledge, the judgment for dissolution of

marriage did not address funds that he received from his family, and he had never had discussions with anyone about whether the funds he received from his family could be considered income. He also testified that, if his mother were to pass away, there would be tax implications for the trust because there may not be enough money left over to pay the estate taxes. "That's why there is an obligation for [him] to pay when [he is] ready to pay those funds back when [he is] working again."

¶ 19    Zachary also testified that he discussed with his uncle how he would repay the money he borrowed from the trust given that he was neither working nor earning any income. He told his uncle that he would be "back in the game" and would able to repay the trust once he got over some of the hurdles in his life. He had worked for his uncle at Follett Corporation for 20 years, and his uncle was aware of his employment history and ability to earn a high income. He stressed to his uncle that he had made as much as $500,000 in prior years, and he believed he would make that much again soon.

¶ 20    When Zachary needed money from a source other than his mother's trust, he would seek funds directly from either his mother or father. For example, Zachary testified that his father expended significant sums on his behalf in connection with litigation initiated in federal court by Urumqi Trade Enterprises against Worldwide, Zachary in his personal capacity, and a business formerly owned by Zachary's father, Rourke Publishing Group. On October 4, 2017, the litigation resolved wherein Zachary, Worldwide, and Rourke agreed to pay Urumqi $2,000,000 over the course of four installments of $500,000 each, and Rourke agreed to pay Urumqi $250,000.

¶ 21    Zachary and Worldwide subsequently entered into an agreement with his father and Rourke on February 1, 2018, wherein Zachary agreed to be personally liable for the $2,000,000 owed to Urumqi. The agreement noted that his father had already "loaned Zac/WWTP [Worldwide] approximately $460,000," and it provided that said loan would be forgiven if "Zac/WWTP make

all Settlement Payments [to Urumqi] when due." Zachary testified that his father made the first two installment payments of $500,000 on his behalf directly to Urumqi. Zachary did not have any promissory notes regarding the $1,000,000 his father paid on his behalf, but he believed that the February 1, 2018, agreement with his father "suggest[ed] that [he was] going to reimburse him or pay him back if [he] ever had the money." Zachary testified that he tried to borrow the money from his mother's trust to repay his father, but he was unsuccessful because "they will not give [him] any more money." Zachary likewise had not repaid his father any part of the $460,000 that was noted in the February 1, 2018, agreement, and there was no fixed date for when Zachary had to repay his father. Zachary also testified that he paid his attorney $103,638.96 as of August 2017 in connection with the Urumqi litigation, and said amount was paid directly from his checking account with funds he borrowed from his family.

¶ 22    Zachary denied failing to repay any of the funds he borrowed from his family. He testified that he repaid his father "about $25,000" sometime in 2016, although he could not recall which month. Apart from the $25,000 payment to his father, he had "not yet" repaid any of the funds he borrowed from his father. He also could not recall repaying his mother any of the funds she contributed to his checking account either before or after the dissolution of marriage, and he had not repaid any of the funds he borrowed from her trust as reflected in the promissory notes.

¶ 23    Anna testified that she was married to Zachary for 14 years. Zachary was the primary earner for the household, but they also received money from his family whenever they needed it, such as when their "credit cards would run up too high." About 13 or 14 years ago, they received approximately $100,000 from Zachary's family to purchase the marital residence in Lakewood, Illinois. Zachary told her that they would likely never have to worry about repaying the money. They received other funds during the marriage, as well. Zachary handled their finances, and "any

time there was money needed, [Zachary] would call the family, and we would get money." She did not have any discussions with Zachary during their marriage regarding whether repayment was required, and she was not present for any of the conversations whereby Zachary received money from his family.

¶ 24    On September 12, 2018, the circuit court announced its findings on Anna's petition for rule to show cause. We recite only those findings that are relevant to Anna's appeal or necessary to an understanding of the issue presented. The circuit court began by observing that the child support provision in the MSA was ambiguous, in that it failed to specify when the $234,000 would accrue or how the additional 32% would be paid. Noting that the agreement provided for annual verification of Zachary's income, the court interpreted the agreement as providing base child support and additional child support for income exceeding $234,000, with the amount of Zachary's income resetting every calendar year. The court then went on to compartmentalize its ruling by year.

¶ 25    The court began by noting that seven months remained in 2015 when the parties' marriage was dissolved. It therefore adjusted the annual gross income threshold *pro rata* from $234,000 to $136,500. The court observed that $291,567.97 was deposited into Zachary's checking account during this timeframe, and the only sources for the various deposits were his mother, his father, and the trust. Because Zachary did not produce any promissory notes or loan documents executed in 2015, the court concluded that the entire amount was a gift such that it was income for purposes of child support. The court explicitly found that Zachary's testimony concerning the existence of other promissory notes that he simply did not produce was "unconvincing and not persuasive." It also noted that Zachary received $89,659 from the liquidation of his IRA, and it likewise attributed this sum as income. Accordingly, it subtracted $136,500 from his total income of $381,226.47,

multiplied the result by 32%, and ruled that Zachary owed $78,312.63 in additional child support for 2015.

¶ 26    Regarding 2016 and 2017, the court found that the promissory notes produced by Zachary and admitted into evidence were clear and convincing proof that there were loans during these years in the amount of $390,000 and $180,000, respectively. It also observed that the unrebutted evidence demonstrated that $707,403.85 and $465,571.18 was deposited into Zachary's checking account in 2016 and 2017, respectively. The court went on to individually calculate the additional child support owed for each year by subtracting $234,000 and the loan totals from the annual deposits, then multiplying the result by 32%. After performing these calculations, it determined that Zachary owed additional child support of $26,689.23 for 2016 and $16,502.78 for 2017. Concerning 2018, the court noted that Zachary's income was not yet at issue because the year was not over, and it was unclear whether his income that year would trigger the additional child support provision set forth in the MSA. Based on the foregoing, the circuit court entered judgment in favor of Anna for $121,504.64 in additional child support for the years 2015, 2016, and 2017. Anna timely appealed.

¶ 27                                    II. ANALYSIS

¶ 28    On appeal, Anna argues that the circuit court (1) abused its discretion in finding that Zachary demonstrated by clear and convincing evidence that the funds he received from his mother's trust as reflected in the 2016 and 2017 promissory notes were loans rather than gifts; and (2) even if the circuit court appropriately classified the proceeds as loans, it should have nevertheless deemed them income for purposes of child support. She stresses that, had the circuit court included the proceeds reflected in the promissory notes for the years covered by the court's ruling ($390,000 and $180,000 in 2016 and 2017, respectively), the total arrearage would have

been $303,904.64—or $182,400 more than the $121,504.64 awarded by the court. We address only Anna's first argument, which is meritorious and dispositive.

¶ 29    In general, matters involving child support and the judicial determination of a child support arrearage are reviewed for an abuse of discretion. *In re Marriage of Schomburg & Osland*, 2016 IL App (3d) 160420, ¶ 19. Further, it is well-established in Illinois that a transfer of property from parent to child is presumed to be a gift. *In re Marriage of Wanstreet*, 364 Ill. App. 3d 729, 735 (2006). The gift presumption may be overcome only by clear and convincing evidence to the contrary. *In re Marriage of Hagshenas*, 234 Ill. App. 3d 178, 186 (1992). The gift presumption, coupled with the applicable standard of review, necessitates that we evaluate whether the circuit court abused its discretion in finding that Zachary demonstrated by clear and convincing evidence that the sums he received from his mother's trust as noted in the 2016 and 2017 promissory notes were loans and not gifts.[1] A trial court abuses its discretion when its decision is arbitrary, fanciful, or unreasonable, or when no reasonable person would take the view adopted. *In re Marriage of*

---

[1] The parties appear to agree that the burden at hearing was on Zachary to rebut the presumption of a gift because the funds were transferred to him from his mother's trust. See, *e.g.*, *In re Marriage of Wanstreet*, 364 Ill. App. 3d 729, 736 (2006). This presumption can be overcome only by clear and convincing evidence. *In re Marriage of Patel & Sines-Patel*, 2013 IL App (1st) 112571, ¶ 76. Zachary argues in his brief that the circuit court did not err in finding that the promissory notes were clear and convincing evidence that the money he obtained from his mother's trust was a loan. Thus, we assume for purposes of our review that a gift presumption arose upon the transfer of the funds to Zachary and that the onus was on him to rebut the presumption at hearing by clear and convincing evidence.

*Lindman*, 356 Ill. App. 3d 462, 467 (2005). We note that, here, the parties agree that the abuse-of-discretion standard applies to Anna's first argument.

¶ 30    It is well-established that, for purposes of determining child support, monetary gifts are income. *In re Marriage of Rogers*, 213 Ill. 2d 129, 137 (2004) (*Rogers II*). Loans, on the other hand, should generally not be considered income. *In re Marriage of Tegeler*, 356 Ill. App. 3d 448, 458 (2006). This is so because loans usually do not increase an individual's wealth, and because "loans" are not mentioned in the Black's Law definition of "income" as quoted in *Rogers II* by our supreme court. *Tegeler*, 356 Ill. App. 3d at 458. A key factor in evaluating whether a loan is income for purposes of calculating child support is whether repayment is required or even intended when the loan was made. *In re Marriage of Baumgartner*, 384 Ill. App. 3d 38, 52 (2008).

¶ 31    We agree with Anna that the circuit court abused its discretion in finding that Zachary established by clear and convincing evidence that the substantial sums he received from his mother's trust in 2016 and 2017 were loans and not gifts. Accordingly, these sums should not have been excluded from Zachary's income in calculating his additional child support obligation under the parties' MSA. In reaching this conclusion, we are guided by our supreme court's decision in *Rogers II*, 213 Ill. 2d 129 (2004), which is largely analogous to the facts of this case. There, our supreme court evaluated whether cash gifts and "loans" received by the father obligor from his parents constituted income for purposes of calculating child support. *Id.* at 131. The trial court had granted the mother's motion to increase child support and, in calculating the father's net income, it determined that the father earned $15,000 per year from his teaching job, as well as received $46,000 per year in gifts and loans from his parents. *Id.* at 133. Predicated on the combined amount of $61,000, the trial court increased his support obligation accordingly. *Id.* The father moved for reconsideration, arguing that the court improperly included the $46,000 in gifts

and loans he received from his family, and that only the $15,000 he earned at his job should have been considered. In response, the mother noted that, by the father's own testimony, the gifts and loans he received from his family "represent a steady source of dependable annual income *** he has received each year over the course of his adult life," and he had never been required to repay any of the loans. *Id*. at 134. The circuit court denied reconsideration, and the father appealed. The First District affirmed, holding that both gifts and loans are income. See *In re Marriage of Rogers*, 345 Ill. App. 3d 77, 79-80 (2003) (*Rogers I*). In specifically addressing the loans, the First District reasoned that there was no authority for the father's contention that loans may be excluded from income because section 505(a)(3) of the Illinois Marriage and Dissolution of Marriage Act (Marriage Act) (750 ILCS 5/505(a)(3) (West 2002)) provided only for the deduction of 'expenditures for repayment of debt," but not the deduction of loan proceeds. *Id*. at 80; *contra Tegeler*, 365 Ill. App. 3d at 458 (stating that loans should generally not be considered income).

¶ 32    Our supreme court granted leave to appeal and affirmed the appellate court's decision. *Rogers II*, 213 Ill. 2d at 137. Noting that the term "income" was not separately defined in section 505 of the Marriage Act, the court gave it its plain and ordinary meaning, stating:

> "As the word itself suggests, 'income' is simply 'something that comes in as an increment or addition ***: a gain or recurrent benefit that is usu[ally] [*sic*] measured in money ***: the value of goods and services received by an individual in a given period of time.' [Citation.] It has likewise been defined as '[t]he money or other form of payment that one receives, usu[ally] [*sic*] periodically, from employment, business, investments, royalties, gifts, and the like.' " *Rogers II*, 213 Ill. 2d at 136-37 (quoting Webster's Third New International Dictionary 1143 (1986); and Black's Law Dictionary 778 (8th ed.2004)).

¶ 33    In concluding that the circuit court was correct to include the annual gifts he received from his parents, the court observed that the gifts "represented a valuable benefit to the father that enhanced his wealth and facilitated his ability to support" his child, such that "they *** qualify as 'income' and were properly considered by the circuit court." *Rogers II*, 213 Ill. 2d at 137.

¶ 34    The court then turned its attention to the "loans" and observed as follows:

> "For purposes of determining a parent's net income, section 505 of the Act authorizes the deduction of amounts expended in repayment of certain types of debts. There is no corresponding provision authorizing the exclusion of loan proceeds. Accordingly, the appellate court reasoned that under the language of the Act, the circuit court acted correctly when it included the money the father's parents loaned him when it calculated his support obligations. [Citation.]
>
> Although the father challenges the appellate court's construction of the statute, we have no occasion in this case to address whether and under what circumstances loan proceeds are properly regarded as an element of income for child support purposes. The reason for that is that the sums at issue here are loans in name only. According to the mother, whose testimony was found to be more credible by the circuit court, the father had never been required to repay any part of the substantial 'loans' given to him each year by his parents. She stated that by the father's own testimony, those sums 'represent a steady source of dependable annual income *** he has received each year over the course of his adult life.' That being so, the money the father received from his parents was no less 'income' than the gifts they gave him or the salary he received from his teaching job." *Id*. at 139-40.

¶ 35　Turning to the case at bar, the "loans" the trial court subtracted from Zachary's income are more accurately characterized as gifts such that they should have been included in his income in calculating his additional child support obligation under the MSA. In other words, the substantial "loans" that Zachary received from his mother's trust are loans in name only. The documentary evidence, as well as Zachary's own testimony, confirm that a total of $1,584,113.58 was deposited into his checking account between the date of dissolution and July 2018. As noted by the circuit court in issuing its ruling, Zachary testified that the exclusive sources of these deposits were his father, his mother, and his mother's trust. Zachary testified that he supported himself entirely with these funds because he had not earned any income since 2014—the last year he filed a federal income tax return.

¶ 36　Here, just as in *Rogers II,* Zachary has never been required to repay any part of the substantial sums he has received from his family—including the $570,000 he obtained from his mother's trust in 2016 and 2017. Attempting to distinguish *Rogers II*, Zachary asserts in his brief that he has "demonstrated that he has repaid debt, at least one time paying back his father the sum of $25,000." He argues "there is no evidence to show that there is any history of Zachary failing to repay loans to his family," and he maintains that his demonstrated history of debt repayment is uncontroverted. He produced no documentary evidence, either in discovery or at hearing, to establish the repayments, but rather, he points only to the following hearing testimony:

> "Q. [By Anna's counsel]: Mr. Colandrea, throughout these time periods which we have just covered, you've received various payments from the trust, an account that you might have owned, as well as an account that your father owns, correct?
>
> A. [By Zachary]: Yes.
>
> Q. And you have not repaid any of those funds as of today, correct?

MR. BRODY [Zachary's counsel]: Objection, form of the question.

THE COURT: Overruled.

A. I have made payments, yes.

Q. Okay. Who have you made payments to?

A. Jim Colandrea [Zachary's father].

Q. And when have you made payments to—

A. I have no idea. I just know I've made a couple payments to him. I've made a payment to my mom. I would have to get the specific details.

Q. But during this entire period, by your prior testimony, you have not had any income, correct?

A. Right. I was using my father's money to pay my mom and my mom's money to pay my dad.

*** 

Q. Okay. And when would this *** payment to your father have been?

A. I'd have to think about it. I can't remember. I remember he— he lent me money on a short-term, knowing that my mom was going to borrow me some money. And he goes I'll give it to you as long as you're, you know— you're going to get this money from your mother and pay me back. And I think that was in 2016.

Q. Do you remember what month?

A. Not off the top of my head.

Q. Do you remember how much it was?

A. About $25,000."

¶ 37    Zachary's testimony plainly contradicts his assertion that he has repaid loans to his family on prior occasions because, by his own admission, he used his father's money to pay his mother and his mother's money to pay his father.  As noted, he also testified that he tried to borrow additional funds from his mother's trust in order to repay his father in connection with the sums his father expended on his behalf to settle the litigation initiated by Urumqi.  Zachary was unsuccessful, and he testified that "[t]hey will not give me any more money."  This is not a history of family loan repayment, as Zachary argues in his brief—this is a history of robbing Peter to pay Paul.  To conclude otherwise would defy commonsense.

¶ 38    The evidence also established that, just like the father in *Rogers II*, Zachary received steady and substantial sums from his family over the course of his adult life, both during the marriage and after.  In his November 28, 2016, financial affidavit, Zachary indicated that he was unemployed and earned no income, stating "[a]ny money I receive is from my parents.  The amount varies depending on my needs and is considered a loan."  He also listed monthly living expenses of $18,010 per month, including nearly $9000 for a first and second mortgage, $1200 in entertainment, dining out, and hobbies, $733 for lawn care and house cleaning, $700 for clothing and dry cleaning, and $643 for a leased vehicle.   In his October 3, 2017, financial affidavit, Zachary reported that he was still unemployed and that his total living expenses had increased to $20,388 per month.  He identified the $3500 per month stipend he received from his mother's trust as his only income and stated "[m]y "parents loan me money based upon my needs."  Thus, by his own omission, Zachary receives money from his family *as needed*.[2]

_____

    [2] The impetus for the "loans," by Zachary's own testimony, was to provide himself a means to maintain his lifestyle in the absence of income.  We observe that the stated *need* for these funds

¶ 39    The evidence also established that Zachary's dependence on his family's resources began long before the hearing on Anna's petition.  For example, he testified that he borrowed $88,000 from his mother's trust in August 2012 and an additional $28,244 in January 2014 so that he could pay off credit card debt.[3]  He agreed at hearing that his family provided him financial assistance for the payment of liabilities during the marriage.  As of the date of the hearing, Zachary had repaid none of these funds.  Following the dissolution of marriage on June 1, 2015, through July 2018, Zachary's testimony and checking account records confirm that he received an additional $1,584,113.58 deposited into his checking account from his father, his mother, and his mother's trust.  He also received the benefit of funds that were paid directly on his behalf, such as when the proceeds from the sale of the marital residence were insufficient to cover all the debt.  Zachary testified that, at his request, his mother's trust paid directly the deficiency of $118,632.46 reflected on the closing statement.  It therefore stands to reason that the $1,584,113.58 that was deposited into Zachary's checking account from June 1, 2015, through July 2018 does not include the $118,632.46.  None of the funds Zachary received or had the benefit of during his adult life had been repaid as of the date of the hearing.  These funds, just like in *Rogers II*, represent a steady source of dependable annual income that Zachary has relied on, depending on his "needs."

---

shares no resemblance to those of the borrowers in cases wherein loan proceeds were deemed not to be income for child support purposes.  See *Tegeler*, 365 Ill. App. 3d at 457 (holding that a line of credit utilized by a farmer to operate his farm was not income because, among other reasons, there was no evidence he used the loans for anything other than farming purposes); and *Baumgartner*, 384 Ill. App. 3d at 52 (holding that a residential mortgage loan made by a bona fide lender is not income).

[3] These sums appear in the first two promissory notes in Zachary's exhibit No. 2.

¶ 40    We acknowledge that the "loans" in instant matter are distinguishable from those in *Rogers II* in one critical aspect—here, the obligor father produced promissory notes in support of his assertion that the significant funds he received from his family were loans. Zachary's nakedly self-interested testimony is not supported by any objective evidence and, indeed, the record is devoid of any evidence that the notes are reliable or that repayment is expected.

¶ 41    For instance, Zachary completed financial affidavits in November 2016 and October 2017, but neither include any of the promissory notes purportedly owed to his mother's trust under the "my debts" heading on the form. Although both affidavits list "Diana Mikos; personal loan— $575,000" in this portion of the form, Zachary testified that the funds he borrowed from his mother's trust were "separate and apart from the debts to [his] mother [in her personal capacity]," and he did not include the loans from the trust on his financial affidavits because he "just didn't include them" and he "didn't know to include the promissory note[s]." Zachary later contradicted this testimony, stating that he did not list any debt owed to his mother's trust on the affidavits because the $575,000 figure was "inclusive of some of the trust numbers." We note that the affidavits were completed approximately one year apart—a period between which three promissory notes were purportedly executed relative to his mother's trust, namely: a $30,000 loan on December 1, 2016; a $26,000 loan on December 22, 2016; and another $30,000 loan on September 14, 2017—yet the total debt owed to his mother as expressed in Zachary's October 2017 affidavit was the same as in his November 2016 affidavit, notwithstanding an additional $86,000 in new "loans." This omission suggests both that Zachary did not actually consider these payments to be loans, nor were they "inclusive" of the $575,000 personal loan from his mother as indicated on his financial affidavits.

¶ 42    Moreover, the timing of the production of the promissory notes is significant.  The record confirms that Zachary did not produce any of the promissory notes in response to Anna's October 2017 request for production until after an order for discovery sanctions was entered against him on August 15, 2018.  Zachary testified at hearing that he did not initially produce any of the notes because he did not think he was asked for them but, on further examination, he acknowledged that promissory notes had been requested.  Similarly, Zachary's testimony concerning when he signed the notes was also inconsistent.  Zachary's checking account statements confirm that the date and amount of every deposit from his mother's trust coincide directly with the date and amount he wrote on the promissory notes.  Zachary initially testified that he did not backdate any of the notes, but he later acknowledged that he dated the notes with the date of the transfer, not the date he truly signed them.

¶ 43    The notes also bear only Zachary's signature, and there is no evidence that anyone else was involved in their preparation.  Zachary testified that he completed each note by writing in the amount and date, and he then mailed a copy to his mother for her records.  These documents, alone, are insufficient to satisfy Zachary's burden of persuasion, especially in light of the circuit court's announcement that Zachary's testimony was not credible concerning the existence of other, additional promissory notes that he simply did not produce, as well as the court's observation in announcing its ruling that "[Zachary's] testimony alone does not cross this threshold and carry this burden."  Put simply, in the absence of any corroborating evidence or testimony, these promissory notes are an extension of his testimony.  Relying on *Leopold v. Halleck*, 106 Ill. App. 3d 386 (1982), Zachary posits that the promissory notes were *prima facie* evidence of a debt such that, once admitted into evidence, the burden shifted to Anna to rebut Zachary's testimony.  *Leopold* is inapplicable because it involved an action to collect on a promissory note under the Uniform

Commercial Code between a lender and borrower. As such, it does not aid Zachary's argument that the funds he obtained from his mother's trust were not gifts subject to the additional child support provision in the MSA.

¶ 44 Finally, apart from his own testimony, there is no evidence that Zachary will be required to repay the loans. A determining factor of whether a loan is "income" is whether repayment is required. See *Baumgartner*, 384 Ill. App. 3d at 52. Zachary testified that if he does not repay the loans by the maturity date, he anticipated that the loans would be restructured so that the due dates would be extended. Candidly, he acknowledges in his brief that "one cannot say the source of income from which [he] will repay the debts due [to] his mother or father." Based on the above, there is no evidence other than Zachary's testimony to conclude that his family either expected or even anticipated that the funds would be paid back. They are "loans" in name only. In light of our resolution of this issue, we need not address Anna's second argument.

¶ 45                    III. CONCLUSION

¶ 46 We find that the circuit court abused its discretion in concluding that the funds Zachary received from his mother's trust in 2016 and 2017 were loans and not gifts. Accordingly, pursuant to our authority under Illinois Supreme Court Rule 366(a)(5) (eff. Feb. 1, 1994), we modify the circuit court's September 12, 2018, order calculating Zachary's additional child support under the terms of the parties' MSA for the years 2015, 2016, and 2017, from $121,504.64 to $303,904.64.

¶ 47 Affirmed as modified.