NOTICE

Decision filed 10/31/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 220221-U

NO. 5-22-0221

IN THE

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of |
| KYLE D. W., | ) | Perry County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | No. 20-D-70 |
| and | ) | |
| | ) | |
| BRITTANY C. W., | ) | Honorable |
| | ) | Julia R. Gomric, |
| Respondent-Appellant. | ) | Judge, presiding. |

_____

JUSTICE WELCH delivered the judgment of the court.
Justice Barberis concurred in the judgment.
Justice Cates specially concurred in part and dissented in part.

**ORDER**

¶ 1    *Held*: The trial court's decision is affirmed where the court's denial of the respondent's request to appoint a guardian *ad litem* was not an abuse of the court's discretion; the court's decision to restrict the respondent's parenting time was not an abuse of discretion; the court's decision that the petitioner's address would be the minor child's primary address for school enrollment purposes was not against the manifest weight of the evidence, was not manifestly unjust, and was not an abuse of discretion; the court's denial of the respondent's request for maintenance was not an abuse of discretion; the court's refusal to find that the petitioner dissipated marital assets was not against the manifest weight of the evidence; and the court's ruling that funds received by the respondent from her parents were marital funds because they were a wedding gift to the parties was not against the manifest weight of the evidence.

1

¶ 2    This appeal concerns a dissolution of marriage action between the petitioner, Kyle W., and the respondent, Brittany W.  Brittany raises six arguments on appeal: (1) the trial court erred in denying her request to appoint a guardian *ad litem* (GAL) in the proceedings, (2) the court's ruling to restrict her parenting time was erroneous, (3) the court erred in ordering Kyle's address to be the minor child's primary address for school, (4) the court's denial of her request for maintenance was against the manifest weight of the evidence, (5) the court's refusal to find that Kyle dissipated marital assets was against the manifest weight of the evidence, and (6) the court's ruling that funds received by Brittany from her parents were marital funds was against the manifest weight of the evidence.  For the following reasons, we affirm.[1]

¶ 3                                I. BACKGROUND

¶ 4    Brittany and Kyle were married on October 19, 2013.  They had one child during the marriage, R.W., born November 2, 2014.  On December 7, 2020, Kyle filed a petition for dissolution of the marriage.  On March 23, 2021, Kyle filed an emergency motion to set parenting time and parental responsibilities and to restrict Brittany's parenting time.  In the motion, Kyle contended that he was concerned with Brittany's relationship with Logan T., who had an extensive history of domestic abuse and a pending felony charge for

---

[1]Pursuant to Illinois Supreme Court Rule 311(a)(5) (eff. July 1, 2018), except for good cause shown, this court is to issue a decision within 150 days after the filing of the notice of appeal.  Accordingly, Rule 311(a)(5) required the decision in this case to be filed on or before September 8, 2022.  In order to give this case the attention it deserves, this court finds it necessary to file this disposition past the due date, and we find good cause to issue our decision outside the 150-day timeframe.

domestic battery, and he believed that Logan was living with Brittany on a full-time basis. Therefore, he argued that it was in R.W.'s best interests for him to receive the majority of parenting time and be granted parental responsibilities. He also argued that it was in R.W.'s best interests that Brittany's parenting time be restricted to not allow Logan to be present during her parenting time.

¶ 5 In support of his arguments, Kyle pointed to the following pending criminal charges/convictions and orders of protections against Logan: (1) a Class 4 felony charge for domestic battery in Clay County (case No. 19-CF-111); (2) a violation of a no-contact bond provision with the victim in the domestic battery case; (3) a plenary order of protection entered on November 27, 2019, in Clay County (case No. 19-OP-94), based on allegations that Logan threw his ex-wife on the bed and held a knife to her throat while stating that she would never leave him, that he killed their dog, and that he committed another act of domestic violence against her by throwing her to the floor, getting on top of her while squeezing her arms to the ground, and busting her lip; (4) a Class A misdemeanor conviction for violating an order of protection in White County (case No. 11-CM-219); (5) a plenary order of protection entered on December 19, 2011, in Richland County (case No. 11-OP-42) based on allegations that, on three separate occasions, he committed acts of domestic violence against Bianca G., which included throwing her against a wall and busting the back of her head open, slapping her in the face, and choking her; and (6) a plenary order of protection entered on September 21, 2004, in Edwards County (case No. 04-OP-31).

¶ 6    On April 22, 2021, the trial court entered an order following a hearing on temporary matters, which denied Kyle's request to limit Brittany's parenting time. However, the court found that Logan's relationships with R.W. and Brittany were not in R.W.'s best interests and, thus, prohibited him from being present during Brittany's parenting time. The court also found that Brittany had not placed R.W.'s needs before her own with regard to her relationship with Logan. However, the court awarded the parties temporary equal parenting time and joint decision-making authority.

¶ 7    On April 29, 2021, Brittany filed a motion to appoint a GAL to assist in determining R.W.'s best interests. On May 7, 2021, Kyle filed an objection to Brittany's motion, arguing that, considering the nature and adequacy of the evidence already presented at the lengthy temporary relief hearing, there was no need for the appointment of a GAL as it would be a waste of the parties' financial resources. At the July 22, 2021, hearing, the trial court found that the appointment of a GAL would increase costs, delay the proceedings, and would not bring any additional evidence that could not be brought in through other means, such as other witnesses. The court noted that it was important that the matter be resolved soon, especially since Brittany was pregnant. Thus, the court denied Brittany's request for the appointment of a GAL.

¶ 8    On July 19, 2021, Brittany filed a notice of intent to claim a dissipation of marital assets totaling $62,948.34. She claimed that the parties' marriage underwent an irretrievable breakdown on or about December 1, 2019.

¶ 9    At the November 2, 2021, trial, Brittany testified that she was 32 years old; she was currently living in the marital residence; she was not employed; she wanted to continue

4

living in the marital residence; and, if maintenance was terminated after the dissolution of the marriage, she would rely on her savings of approximately $18,000 to make the mortgage payment until she found employment (this savings account was a nonmarital account). Although she had previously applied for employment, she was not currently searching for employment because she was pregnant (Logan was the father of the baby), she was due on January 8, 2022, and she did not want to work for a short period of time and then take maternity leave. However, she was enrolled in the business program at Rend Lake College, starting the spring semester of 2022. She was previously employed as a hair stylist, but she and Kyle decided that she would not work so she could be at home with R.W. She had her cosmetology license but would need to become current on the continuing education and purchase the requisite supplies and equipment to actually work as a stylist. Ultimately, she would spend "hundreds of dollars" to reenter this field of work.

¶ 10   In April 2013, Brittany was gifted approximately $27,000 from her parents to use as a down payment on the marital residence. Her parents signed a gift letter, which expressed their intent that the money be considered a gift to Brittany. She paid the remainder of the down payment from her own money, which totaled approximately $10,000. The parties were not married at the time that they purchased the house (they closed on the house in June 2013), but the title and mortgage were in both of their names. The parties also built a deck and put in a pool, which cost approximately $30,000 or $35,000, and the money for those projects came from Kyle's retirement account. The mortgage on the residence was $1061 per month, she had been making the payments since April 2021, and she was using her savings to make the payments. Before that, from

5

December 2020 until April 2021, Kyle made the mortgage payments. She owned a 2016 Range Rover and approximately $39,000 was owed on the vehicle loan; it had an approximate value of $42,000.

¶ 11 Brittany testified that her marriage with Kyle was irretrievably broken in December 2019 when she received a text message saying that, over the last couple of years, Kyle had been cheating on her. She claimed that Kyle had dissipated some of the marital assets after their marriage was irretrievably broken; in June 2020, he transferred $25,000 from their joint account to his individual savings account, and he paid approximately $15,000 toward a loan. Brittany also presented a retirement account summary statement, which showed that he withdrew $96,566.52 between April 2020 and June 2020.

¶ 12 Although Brittany testified that her relationship with Logan began in January 2021, she acknowledged that they had a sexual relationship by at least November 2020. She also acknowledged that she went to a concert with Kyle in February 2020. Before the court order that prohibited Logan from having contact with R.W., Logan spent a significant amount of time at Brittany's house. Since the restriction, he stayed overnight at her house approximately one to three times per week and, depending on whether R.W. was with her father, during the weekend. If there was no order prohibiting him from having contact with R.W., he would be at Brittany's house more often. She explained that, in a perfect world, he would be there daily helping with their baby. However, he would not be moving in with her until after he was sentenced on the domestic battery conviction. The victim of the domestic battery was his ex-wife, and he had a son with her. Brittany explained that she did not believe that Logan was a threat to herself or R.W., but, if she ever felt threatened,

6

she would immediately remove herself from the situation, and no longer allow him to be around.

¶ 13    Brittany acknowledged that she had strong feelings for Logan but explained that her intentions for the future depended on what happened with his sentencing and whether there were any restrictions on him being around R.W.  She had complied with the trial court's temporary order restricting his contact with R.W., but she requested that the court reconsider that ruling because they were having a child together, and it was important that Logan have a relationship with his child.  She explained that she had known him for a long time, they had a strong friendship, and he had never been threatening toward her.  She noted that he was good with children, and he had a close relationship with R.W.

¶ 14    Brittany testified that she and Logan occasionally went out to eat, and they shared the costs of meals; she had cooked for him; he had eaten leftovers at her house; he had gone with her to pick up groceries; he had cooked meals in her kitchen; and he had helped her with yardwork at the house.  They also talked on the phone daily for long periods of time, even during her parenting time with R.W.  Logan did not contribute money for rent, utilities, or other household expenses; they did not have joint bank accounts, he did not get mail at her house, he did not have any designated space in or keep property at her house, and he did not have a key to her house.  Although they had never vacationed together, they spent the Fourth of July weekend together.  They liked to hang out, watch movies, and cook together.  She helped his family's restaurant by providing them with a recipe for the menu.

¶ 15 Brittany testified that it was important for R.W. to spend time with Kyle, and she encouraged R.W. to have fun while at Kyle's house. She acknowledged that Kyle was a great father, and R.W. loved him and had fun with him. She requested that they have equal parenting time because she believed that was in R.W.'s best interests. Brittany believed that, if Kyle was given the majority of the parenting time, R.W. would be devastated because she and R.W. were very close.

¶ 16 Brittany testified that R.W. was currently seven years old and was in first grade. R.W. had a great personality; was very fun, outgoing, and smart; loved to read; and did well in school. There had been no major issues with Brittany and Kyle having joint parental decision-making authority, and she felt like that should continue. R.W. was in counseling to help her through the transition and to give her a neutral party to discuss her concerns. Brittany felt that the counseling was helping R.W. express her feelings and teaching her coping mechanisms.

¶ 17 Kyle testified that, although the money from Brittany's parents went into Brittany's account, and the checks only included her name, it was a wedding gift to both of them. He also contributed between $43,000 and $45,000 of his nonmarital funds into adding a deck and pool to the marital residence. As of December 2020, he had $12,730.48 in a retirement account that was marital property. In April or May 2020, he took approximately $80,000 out of that account to pay credit card debt and a debt consolidation loan; the debts were accrued during the marriage. He explained that Brittany liked to spend money and bought expensive clothing, shoes, and bags. In June 2020, he transferred $25,000 from a marital account to his individual account. However, he explained that the money was ultimately

8

returned to the marital account to pay household expenses. Kyle testified that, during the marriage, he was supportive of Brittany staying home to care for R.W. rather than R.W. going to daycare while Brittany worked. He acknowledged that Brittany was a good mother and had a loving relationship with R.W.

¶ 18    Kyle admitted that he hired a private investigator and placed a surveillance camera pointing at the marital residence without Brittany's knowledge. He was worried about Logan being around R.W., and he believed that Logan was living at the house in violation of the trial court's order. However, he discovered that Logan was not at the marital residence while R.W. was there, and Brittany was complying with the court's restriction.

¶ 19    Kyle also explained that he initially sought equal parenting time, but R.W.'s behavior toward him negatively changed, so he decided to seek the majority of the parenting time. R.W. was usually happy, fun, and sassy, but she started questioning him about things that a six-year-old child should not think about, such as why he did not like Brittany or why he did not like Logan, and whether he was recording her on the telephone or lying to her. At the start of his parenting time, he always had to rebuild his relationship with R.W. and spend the first few hours calming her down. She was in a state of continuing confusion and was either initially hysterical or acted negatively toward him. Before the restriction on Brittany's parenting time, Kyle noticed that R.W.'s hostility toward him was exacerbated after she spent time with Logan. She blamed Kyle for not being able to see Logan, and Kyle believed that she was being manipulated by Logan. He was also concerned with Logan's history, he did not share Brittany's outlook on her relationship with Logan, and he was concerned with her ability to put R.W.'s interests before her own.

9

He believed that Brittany encouraged Logan's relationship with R.W. over his relationship with R.W. However, he acknowledged that R.W. had never mentioned to him about any violence or fighting between Logan and Brittany. He also acknowledged that R.W.'s behavior had improved since she started counseling.

¶ 20　On February 18, 2022, the trial court entered a judgment of dissolution of marriage. In the judgment, the court awarded the parties shared parental decision-making authority and equal parenting time, designated Kyle as the primary parent whose address would be used for school purposes, and entered a parenting time schedule. The court found that Logan's interaction with R.W. was not in her best interests, and the evidence showed, by a preponderance of the evidence, his presence seriously endangered R.W.'s mental, moral, and physical health and would significantly impair her emotional development. Thus, the court found that a restriction on parenting time was appropriate pursuant to section 603.10 of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/603.10 (West 2020)) and prohibited Logan from being present during Brittany's parenting time.

¶ 21　The trial court also awarded Brittany her nonmarital account of approximately $20,000; one-half of Kyle's retirement account, which totaled $6365.24; and the 2016 Range Rover. The court found that, one year before filing the petition for dissolution of marriage, Kyle withdrew money from his retirement account to pay marital debt, which was not a dissipation of marital assets. The court denied Brittany's request for maintenance, noting that there were certain facts regarding Brittany's relationship with Logan that were relevant to this determination. The court found that Brittany's testimony regarding her relationship with Logan was not credible in that the evidence demonstrated

that their relationship started before Kyle filed the petition for dissolution of marriage and that she conceived her child with Logan around the time of the temporary relief hearing.

¶ 22 Although the trial court noted that conceiving a child outside of marriage was not dispositive of a maintenance determination, the evidence showed that Brittany supported Logan financially in that he stayed at the marital residence one to three nights per week, he did not contribute financially to the household expenses when he was there, she provided the food when he stayed there, and he was not employed. The court took judicial notice of Logan's domestic battery case, pointing out that he listed Brittany's address as his own. The court also took judicial notice of Brittany's letter to the court in which she admitted that Logan stayed at her house after their baby was born in violation of the parenting time restriction, and she expressed that she wanted to move forward with her future with Logan. Thus, based on the above, the court found that Brittany and Logan had a *de facto* husband-wife relationship.

¶ 23 Considering the factors listed in section 504(a) of the Act (*id.* § 504(a)), the trial court found that an award of maintenance was inappropriate. The court noted that Brittany was awarded more than one-half of the marital assets and had nonmarital assets of her own, the marriage was relatively short (seven years), she was young and could be employed as a hair stylist with little hardship, her parental responsibilities would not prevent her from working full-time, and she would receive her share of the equity in the marital home.

¶ 24 The trial court also found that the down payment on the marital residence was a wedding gift to the couple and, thus, was marital property. Because Brittany was unemployed and would no longer be receiving maintenance, the court found her testimony

11

that she would be able to refinance the marital home in her name alone unconvincing and not supported by the evidence. Therefore, the court awarded the marital home to Kyle. The court ordered Kyle to pay Brittany $32,008.18 as her one-half interest in the equity in the marital residence. The court also noted that, since parenting time and maintenance were resolved, child support could be determined at a subsequent hearing.

¶ 25   Also on February 18, the trial court entered a parenting plan, in which it reiterated that a restriction on Brittany's parenting time was appropriate. The court took judicial notice of the fact that, on July 21, 2021, Logan was convicted of domestic battery, a Class 4 felony, and on January 14, 2022, he was sentenced to 24 months' probation and 60 days in the county jail. The court also noted that, in addition to Logan's ex-wife, at least one of the women who obtained an order of protection against him testified about his abuse at the criminal trial. The court further noted that it had previously found Brittany in contempt of court because she admitted that Logan was present in the house with R.W. since their child was born. The court found, by a preponderance of the evidence, that Brittany's desire to have R.W. spend time with Logan and her desire that Logan be present during her parenting time seriously endangered R.W.'s mental, moral, and physical health and would significantly impair R.W.'s emotional development. The court noted that Logan was convicted of a felony after he engaged in violent behavior, and evidence was presented that he had been violent with other women. The court explained that it was not persuaded by Brittany's testimony that she was "different" than the other women that he battered in the past. Thus, the court reiterated that Logan was prohibited from being present during Brittany's parenting time with R.W.

12

¶ 26    On March 3, 2022, Brittany filed a motion to reconsider, in which she contended, in pertinent parts, that the restriction on her parenting time was against the manifest weight of the evidence because there was no evidence that Logan's mere presence around R.W. seriously endangered her mental, moral, or physical health; there was no evidence presented of actual harm to R.W.; and the evidence presented demonstrated that R.W. enjoyed being around Logan and was affectionate toward him.  Brittany also contended that, given the trial court's previous ruling on parental restrictions and, knowing that she and Logan had a child together, the court erred in denying her request for the appointment of a GAL where the neutral input of a third party was necessary.  Brittany argued that the court was completely indifferent to the impact its decision would have on the relationship between R.W. and her newborn sibling within the home.

¶ 27    Brittany also argued that the trial court erred in failing to reimburse her for the $25,000 that Kyle transferred from the parties' marital checking account as the money was used by Kyle for nonmarital purposes and erred in finding that Kyle withdrawing $94,557 out of his retirement account, which was marital property, was not a dissipation of marital assets where there was no credible explanation offered for how the money was spent.  She contended that the court erred in denying her request for maintenance where the weight of the evidence did not support the court's finding that she was in a marriage-like relationship with Logan.  She also contended that the court erred in designating Kyle as the primary parent whose address would be used for school purposes and erred in finding that the money that she received from her parents was marital property where the timing and nature of the transaction indicated that it was a gift to her individually.

13

¶ 28    On March 16, 2022, the trial court denied Brittany's motion to reconsider. Brittany appeals.

¶ 29                              II. ANALYSIS

¶ 30                           A. Appointment of GAL

¶ 31    Brittany first contends that the trial court erred by failing to appoint a GAL for R.W. where a GAL could observe R.W.'s interactions with Logan and determine whether R.W. was endangered by Brittany's relationship with him, especially since they shared a child. Section 506(a) of the Act provides that, in any proceeding involving the support, custody, visitation, or general welfare of a minor or dependent child, the court may, on its own motion or that of a party, appoint an attorney to serve as (1) an attorney to represent the child, (2) a GAL, or (3) a child's representative whose duty is to advocate what the representative finds to be in the child's best interests after reviewing the facts and circumstances of the case. 750 ILCS 5/506(a) (West 2020). In determining whether to appoint a GAL for the minor child, the trial court should consider the nature and adequacy of the evidence to be presented by the parties; the availability of other methods of obtaining that information, including social service organizations and evaluations by mental health professions; and resources for payment. *Id.* § 506(a-5). Where the court finds that a child's interests are not properly represented, it has a duty to appoint a GAL. *In re Marriage of Ostrander*, 2015 IL App (3d) 130755, ¶ 30.

¶ 32    The decision whether to appoint a GAL is subject to the sound discretion of the trial court. *In re Marriage of Ricketts*, 329 Ill. App. 3d 173, 182 (2002). An abuse of discretion occurs where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no

14

reasonable person would take the view adopted by the court. *Blum v. Koster*, 235 Ill. 2d 21, 36 (2009).

¶ 33    In this case, the trial court refused to appoint a GAL after a one-half day temporary relief hearing, finding that it would increase the costs, delay the proceedings, and would not add anything that could not be brought in through other means, such as other witnesses. After carefully considering the record, we find that the court did not abuse its discretion in failing to appoint a GAL. There was no indication in the record that R.W.'s interests were not adequately protected or considered by the court. Also, the court properly considered the increase in costs and delay in proceedings when denying Brittany's request. The court noted that it was important that the case be promptly resolved, especially since Brittany was pregnant at that time. Further, we note that Brittany does not argue that the nature and adequacy of the evidence sought to be introduced at trial was lacking compared to evidence that a GAL could discover or that she was unable to offer certain evidence at trial as it was not available through other means or through other witnesses. Therefore, we affirm the court's denial of Brittany's request to appoint a GAL.

¶ 34                              B. Parenting Time Restriction

¶ 35    Section 602.7(a) of the Act instructs the trial court to allocate parenting time according to the child's best interests. 750 ILCS 5/602.7(a) (West 2020). Section 602.7(b) presumes that both parents are fit and allows the court to restrict parenting time if it finds that, by a preponderance of the evidence, a parent's exercise of parenting time would seriously endanger the child's physical, mental, moral, or emotional health. *Id*. § 602.7(b). Section 603.10(a) of the Act (*id*. § 603.10(a)) states:

15

"After a hearing, if the court finds by a preponderance of the evidence that a parent engaged in any conduct that seriously endangered the child's mental, moral, or physical health or that significantly impaired the child's emotional development, the court shall enter orders as necessary to protect the child."

Therefore, section 603.10(a) sets out a two-step process to restrict parenting time. *In re Marriage of Mayes*, 2018 IL App (4th) 180149, ¶ 58. First, the trial court must make a factual determination that the preponderance of the evidence demonstrates that the parent has engaged in conduct that seriously endangers the child's mental, moral, or physical health or that significantly impairs the child's emotional development. *Id.* If the court finds that the evidence is sufficient to make such a determination, then it must enter the necessary orders to protect the child. *Id.*

¶ 36    In determining the appropriate restrictions to parenting time, the trial court must exercise its discretion. *Id.* It is well settled that courts are vested with wide discretion in resolving parenting time issues. *Id.* ¶ 57. Thus, the court's decision on parenting time will not be overturned on appeal unless the court abused its discretion, or a manifest injustice has been done to the child or parent. *Id.* However, when a party on appeal challenges the sufficiency of the trial court's factual determinations, the appropriate standard is the manifest weight of the evidence standard of review. *Id.* ¶ 59. A court's factual determinations will be found to be against the manifest weight of the evidence if the opposite conclusion is clearly evident based on a review of the record. *Id.*

¶ 37    Here, there were numerous allegations that Logan had previously acted violently toward women who he was in a romantic relationship with, one such allegation ultimately resulted in his conviction for domestic battery for violent behavior toward his ex-wife.

16

Specifically, in August 2004, a petition for an order of protection was filed against him based on allegations that he called the victim, who was 15 years old at the time, a "stupid fucking bitch" and threatened her that "it was on." In April 2011, Bianca G., who was Logan's girlfriend at the time, sought an order of protection against him based on allegations that he grabbed her by the hair and choked her. In 2012, a victim made allegations that he threatened to shoot her in front of her two-year daughter and then threatened to shoot the daughter. When she tried to leave him, he held her down on the bed and told her that she was not leaving him.

¶ 38 In November 2019, domestic battery charges were filed against him based on allegations that he grabbed his wife at the time around her waist and threw her to the ground. He then refused to let her leave unless she got on her knees and begged. She also alleged that he killed their dog and had held a knife to her throat, telling her that she would "never leave him." She had three children living in the house, one of which was Logan's child. He was ultimately convicted of domestic battery based on these allegations.

¶ 39 Brittany explained that, although she was aware of the previous orders of protection and criminal charges against Logan, she was different from those other women because she and Logan had known each other for a long time, and they had a stronger friendship. She also explained that she had never felt threatened by Logan, and, if she did, she would immediately remove herself from the situation. After considering Logan's history and Brittany's testimony, the trial court found, by a preponderance of the evidence, that Brittany's desire to have Logan present during her parenting time with R.W. seriously endangered R.W.'s mental, moral, and physical health and would significantly impair

17

R.W.'s emotional development. The court noted that Logan was convicted of a felony after he engaged in violent behavior, there was other evidence presented that he had been violent with other women, and the court was not swayed by Brittany's testimony that she was different from the other women.

¶ 40 Although Brittany contends that Logan was not a threat to R.W. because none of the allegations against him involved violence toward children or violence committed in the vicinity of children, we find this argument unpersuasive. The petitions for orders of protection against Logan included allegations that he had threatened a 15-year-old child and threatened to shoot a 2-year-old child. Also, there were three children living in the house with him and his ex-wife, and there was an allegation that the children were afraid of him (although we recognize that there were no specific allegations that his behavior was in the presence of the children or directed at the children). Considering the extensive evidence presented to the trial court at the hearing, we conclude that the court's findings regarding Logan's violent tendencies were overwhelmingly supported by the record. Given the finding that, based on Logan's past history, his presence seriously endangers R.W.'s mental, moral, and physical health and significantly impairs her emotional development, the trial court was required to enter the necessary order to protect R.W. Based on the above, we find that the court did not abuse its discretion in restricting Brittany's parenting time.

¶ 41 C. Residential Parent Determination

¶ 42 A trial court's determination of the custodial parent is a matter within the sound discretion of the court. *In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 24. The court

is in the best position to judge the credibility of the witnesses and determine the child's best interests. *Id.* A reviewing court will not reverse a trial court's determination on the residential parent unless it (1) is against the manifest weight of the evidence, (2) is manifestly unjust, or (3) results from a clear abuse of discretion. *Id.*

¶ 43 Here, Brittany argues that the trial court erred in ordering Kyle's address to be used as R.W.'s address for school purposes in that the decision would require R.W. to change schools. In the parenting plan, the trial court ordered as follows: "Father shall be designated as the custodial and/or residential parent for purposes of complying with 750 ILCS 606.10 and the Father's address shall be the [child's] address for school enrollment purposes." Both parties testified that R.W. received good grades and had friends in school, but this was the only evidence offered on this issue. Other than arguing that designating Kyle as the residential custodian will require R.W. to change schools, Brittany offers no argument as to why this decision was manifestly unjust. Thus, we find that, based on the record, the court's decision was not against the manifest weight of the evidence, was not manifestly unjust, and was not an abuse of discretion.

¶ 44                    D. Maintenance Determination

¶ 45 The trial court has wide latitude to consider the needs of the parties when awarding maintenance. *In re Marriage of Schiltz*, 358 Ill. App. 3d 1079, 1084 (2005). Generally, a court's determination on maintenance is presumed correct. *In re Marriage of Heroy*, 385 Ill. App. 3d 640, 650 (2008). Because maintenance awards are within the sound discretion of the trial court, we will not disturb a court's decision on maintenance absent an abuse of

discretion. *Id.* Abuse of discretion exists only where we can conclude that no reasonable person would take the view adopted by the trial court. *Id*. at 651.

¶ 46 Section 504(a) of the Act permits the trial court to grant maintenance for either spouse in amounts and for periods of time as the court deems just and sets out the factors the court should consider when awarding maintenance. 750 ILCS 5/504(a) (West 2020). The factors include: (1) the income and property of each party; (2) the needs of each party; (3) the present and future earning capacity of each party; (4) any impairment of the present and future earning capacity of the party seeking maintenance; (5) any impairment of the realistic present or future earning capacity of the party against whom maintenance was sought; (6) the time necessary to enable the party seeking maintenance to acquire education, training, and employment; (7) the effect of any parental responsibility arrangements and its effect on a party's ability to seek or maintain employment; (8) the standard of living established during the marriage; (9) the duration of the marriage; (10) the age, health, occupations, and employability of the parties; (11) all sources of private income; (12) the tax consequences to each party; (13) contributions by the party seeking maintenance to the education, training, career, or career potential of the other spouse; (14) any valid agreement of the parties; and (15) any other factor the court finds to be just and equitable. *Id.*

¶ 47 In the present case, after considering the above factors, the trial court found that an award of maintenance to Brittany was inappropriate. In making this decision, the court made the following findings: Brittany was in a *de facto* husband-wife relationship with Logan where the evidence demonstrated that she was supporting him financially; he stayed

in the marital residence one to three nights per week when R.W. was not there; he did not contribute financially toward the household expenses; Brittany provided food to him when he stayed at her house; he was not employed (although he did some work for Instacart); Brittany admitted that he stayed at her house after their child was born to help with the baby (in violation of the court's restriction); she had written a letter to the trial court, which stated that she and Logan wanted to move on with their future; and he had previously listed Brittany's address as his own address.

¶ 48    The trial court also found that Brittany was awarded more than one-half of the marital assets and had nonmarital assets of her own; the marriage was relatively short; Brittany was in her early thirties; she had previously worked as a hair stylist before her marriage to Kyle, she maintained her cosmetology license, and she could employ herself similarly with little hardship; she could work full-time while Logan cared for their baby and while R.W. was in school; and she was awarded equity for her share of the marital residence.

¶ 49    Brittany contends that this decision was against the manifest weight of the evidence where she was unemployed, and her current earning capacity was zero dollars because she was about to have a baby; she would need to spend hundreds of dollars on supplies and continuing education courses to work as a hair stylist; Kyle's income as of February 2021 was $10,576.92 per month; Kyle was awarded the marital residence; she needed some time to obtain an education and was enrolled in Rend Lake's business program, which would increase her future earning capacity; she was not employed during their seven-year marriage because she stayed home to care for R.W.; she could not support herself through

21

employment while caring for two children and attending school full-time; and she had a high standard of living during the marriage. Brittany also argues that the trial court's decision that she was in a *de facto* husband-wife relationship with Logan was against the manifest weight of the evidence.

¶ 50    After carefully considering the record and the section 504(a) factors, we find that the trial court's denial of maintenance was not an abuse of its discretion, and the court's factual findings were not against the manifest weight of the evidence. Although Brittany was unemployed and pregnant at the time of the trial and had not worked during the marriage, she was awarded the following in the dissolution: a 2016 Range Rover; $6365.24 from Kyle's retirement account; and one-half of the equity in the marital home, which totaled $32,008.18. She also had nonmarital assets, was young, and presented no evidence as to why she was unable to be employed while R.W. was attending school and Logan stayed with their baby.

¶ 51    As for the trial court's decision that she was in a *de facto* husband-wife relationship with Logan, we also conclude that this finding was not against the manifest weight of the evidence. In determining whether a spouse is cohabitating with another on a resident, continuing, conjugal basis, the court considers various factors defining that relationship, such as (1) the length of the relationship, (2) the amount of time the couple spends together, (3) the nature of the activities they engaged in, (4) the interrelation of their personal affairs, (5) whether they vacation together, and (6) whether they spend holidays together. *In re Marriage of Herrin*, 262 Ill. App. 3d 573, 577 (1994). The court should consider the totality of the circumstances. *Id.* Each case rests on its own unique set of facts, and a

22

reviewing court will not disturb the trial court's determination concerning the existence of a *de facto* husband-wife relationship unless that determination is contrary to the manifest weight of the evidence. *In re Marriage of Sunday*, 354 Ill. App. 3d 184, 189 (2004).

¶ 52    In this case, looking at the above factors, the evidence demonstrated that Brittany and Logan had a child together; Logan had done yardwork at her residence; she had cooked meals for him; he had eaten leftovers at her home; they shared the costs of meals when dining out; he stayed at her home one to three nights per week when R.W. was not there; he had stayed there more frequently before the restriction was in place; they talked on the phone daily for long periods of time, even during her parenting time with R.W.; they watched movies, cooked meals, and went grocery shopping together; he parked his vehicle in the garage when there; and he previously listed her address as his own. As for the length of their relationship, although Brittany testified that she and Logan had been in a relationship for one year, the trial court found that her testimony was not credible as to when their relationship actually began. Considering all of these circumstances, we conclude that sufficient evidence exists to support the trial court's decision that Logan and Brittany were in a *de facto* husband-wife relationship. In making this decision, we recognize that Brittany cites *In re Marriage of Herrin*, 262 Ill. App. 3d 573 (1994), and *In re Marriage of Sunday*, 354 Ill. App. 3d 184 (2004), to support her position. However, as we previously explained, each case involving a determination on conjugal cohabitation has its own unique set of facts. Even assuming *arguendo* that this finding was against the manifest weight of the evidence, we conclude that the court's ultimate decision denying Brittany maintenance was not an abuse of discretion where, as noted above, she received a

23

good portion of the marital assets, she had nonmarital assets of her own, she was capable of finding employment, and the duration of the parties' marriage was relatively short. Accordingly, we affirm the trial court's decision denying maintenance.

¶ 53                           E. Dissipation of Marital Assets

¶ 54    Brittany contends that the trial court's finding that Kyle did not dissipate marital assets was against the manifest weight of the evidence. Section 503 of the Act deals with the disposition of property between the parties. 750 ILCS 5/503 (West 2020). In allocating property pursuant to section 503, the trial court must consider any dissipation by the parties. *Id*. § 503(d)(2). Dissipation has been defined as the use of marital property for the sole benefit of one of the spouses for a purpose unrelated to the marriage at a time that the marriage is undergoing an irreconcilable breakdown. *In re Marriage of Brown*, 2015 IL App (5th) 140062, ¶ 66. The determination of whether a spouse has dissipated marital assets depends on the facts of each case. *Id*. "The party charging dissipation should make a preliminary showing of dissipation before the burden shifts to the party charged with dissipation to refute the accusations." *Id*. Once a *prima facie* case for dissipation has been made, the burden shifts to the party charged with dissipation to establish by clear and specific evidence how the funds were spent. *Id*.

¶ 55    Whether there has been a dissipation of assets is a question of fact to be determined by the trial court and such a determination will not be disturbed on appeal unless it is against the manifest weight of the evidence. *In re Marriage of Romano*, 2012 IL App (2d) 091339, ¶ 86. A factual determination will be found to be against the manifest weight of

24

the evidence only when the opposite conclusion is clearly evident or the finding is arbitrary, unreasonable, or not based on the evidence. *Id.*

¶ 56   Here, Brittany claims that Kyle dissipated the following marital assets between April 2020 and June 2020: (1) $25,000, which was transferred from a marital account into his individual savings account; (2) $14,962.09, which was paid toward a loan; and (3) $94,556.52, which Kyle withdrew from his retirement account.  At trial, Brittany testified that her marriage to Kyle began undergoing an irreconcilable breakdown in December 2019 when she received a text message saying that he cheated on her.  However, she acknowledged that she did not file a petition for dissolution of marriage at that time; they went to a concert together in February 2020; and then on December 7, 2020, Kyle filed a petition for dissolution of marriage.

¶ 57   Kyle testified that he used the funds in question to pay off loan consolidation debt and credit card debt that were accrued during the marriage.  He explained that Brittany liked to shop and would buy luxury items, such as Louis Vuitton purses, expensive clothes, and expensive shoes.  He also explained that there were fees taken out of the money that he withdrew from his retirement account, so he did not receive the entire amount.  He testified that, although he initially transferred the $25,000 into his individual account, the money slowly trickled back into the marital checking account to pay for marital expenses. After considering this evidence, the trial court found that Kyle did not dissipate marital assets as the funds were used to pay for marital debt.  Because, based on the record, we find that the opposite conclusion was not clearly evident or the court's finding was not

25

arbitrary, unreasonable, or contrary to the evidence, the court's decision that the funds were not dissipated was not against the manifest weight of the evidence.

¶ 58                                F. Gifts

¶ 59    Before a trial court may dispose of property upon a dissolution of marriage, it must classify the property as either marital or nonmarital property, and the court's classification will not be disturbed unless it is contrary to the manifest weight of the evidence. *In re Marriage of Hagshenas*, 234 Ill. App. 3d 178, 186 (1992). Section 503 of the Act defines marital and nonmarital property. 750 ILCS 5/503(a) (West 2020). There is a rebuttable presumption that all property acquired after the date of marriage but before the entry of judgment of dissolution is marital property, regardless of how title of the property is held. *In re Marriage of Didier*, 318 Ill. App. 3d 253, 258 (2000). In general, property acquired by gift is considered nonmarital. 750 ILCS 5/503(a)(1) (West 2020). Also, a transfer from a parent to a child is presumed to be a gift. *In re Marriage of Toole*, 273 Ill. App. 3d 607, 617 (1995). However, the presumption that property acquired by gift is nonmarital can be overcome by clear and convincing evidence to the contrary. *Id*. The party claiming that the property is nonmarital has the burden of proof. *Didier*, 318 Ill. App. 3d at 258.

¶ 60    Here, Brittany contends that the trial court's finding that the $27,000 received from her parents and used for a down payment on the marital residence was a wedding gift to the parties was against the manifest weight of the evidence. At trial, Brittany explained that, in April 2013, her parents gave her the money to help pay for the down payment on the marital home. Brittany presented two gift letters from Regions Bank that were signed by her parents, which indicated that the money was a gift to her and was put in her

26

individual account. Brittany also contended that she contributed $10,000 of nonmarital funds from her individual account toward the down payment on the marital residence.

¶ 61   Kyle testified that it was his understanding that the money was a wedding gift to both him and Brittany to help them with starting a family and a household. He explained that her parents had given a similar gift to Brittany's sister and brother-in-law. He testified that he also contributed nonmarital funds to the marital residence; he contributed about $23,000 to $25,000 for the addition of a deck and about $20,000 for a pool. Given that the money was given about six months before the parties' wedding, it was to be used for a down payment on the marital residence, and Kyle's testimony about Brittany's parents giving a similar gift to her sister and brother-in-law was uncontroverted, we conclude that the court's finding was not against the manifest weight of the evidence. It was also not against the manifest weight of the evidence for the court to find that the $10,000 that Brittany contributed to the down payment of the marital house was marital property.

¶ 62                                   III. CONCLUSION

¶ 63   For the foregoing reasons, we affirm the judgment of the circuit court of Perry County.


¶ 64   Affirmed.

27

¶ 65    JUSTICE CATES, specially concurring in part and dissenting in part:

¶ 66    I concur in the majority's order in all aspects, save one. After reviewing the record, I conclude that the trial court abused its discretion in denying maintenance to Brittany. I find that the court failed to consider relevant statutory factors as required under section 504(a) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/504(a) (West 2020)). In addition, the court took considered information that it received after the November 2, 2021, hearing to support its finding that Brittany and Logan were engaged in a *de facto* marital relationship. With or without the extraneous evidence, there was insufficient evidence to support the trial court's finding that Brittany and Logan were engaged in a *de facto* husband-and-wife relationship. Therefore, I would vacate that portion of the final judgment denying maintenance and remand the case for a new hearing on the issue of maintenance. Accordingly, I respectfully concur in part, and dissent in part.

¶ 67    Brittany and Kyle were married for more than seven years and had one child, R.W., during the course of their marriage. On December 7, 2020, Kyle filed a petition to dissolve the marriage. On April 22, 2021, the court entered an interim order, awarding equal parenting time to Brittany and Kyle, but prohibiting Brittany's boyfriend, Logan T., from being present during Brittany's parenting time. The court also ordered Kyle to pay $2129.56 per month to Brittany for temporary maintenance.

¶ 68    On October 7, 2021, Kyle filed a motion to terminate maintenance pursuant to section 510 of the Act (750 ILCS 5/510(c) (West 2020)). Kyle asserted that there had been a substantial change in circumstances since the order of April 22, 2021, in that Brittany had been cohabitating with Logan "on a resident, continuing conjugal basis." Kyle asked the

28

court to terminate maintenance retroactive to the date that cohabitation began. Brittany filed a response, denying that she was cohabitating with Logan as alleged.

¶ 69   On November 2, 2021, the trial court held an evidentiary hearing on all contested issues. Following the presentation of evidence, as detailed in the majority's order, the court took the case under advisement.

¶ 70   On January 14, 2022, while the case remained under advisement, Kyle filed a petition for rule to show cause why Brittany should not be held in contempt of court for her willful and contumacious disregard of the court's directive that Logan should not be present during Brittany's parenting time with her minor child. In a response filed January 21, 2022, Brittany admitted that she allowed Logan to be present during her parenting time, but denied that she acted in willful contempt of the court's order. On February 1, 2022, Brittany filed a supplemental pleading, offering a two-page letter as part of her response to the show-cause petition. In this letter, Brittany offered an apology to the court, and explained that she ran afoul of the court's order because she needed Logan's help following an emergency cesarean section during which she gave birth to their baby. Kyle immediately filed a motion to strike the supplemental response, arguing that the letter contained inadmissible hearsay and *ex parte* arguments to the court. He claimed it was an "obviously improper exhibit."

¶ 71   After reviewing Brittany's letter, the trial court cancelled the hearing on the petition for rule to show cause. Without taking any evidence on the merits, the court entered an order finding that Brittany had admitted she violated the terms of prior order as related to Logan. The court held Brittany in contempt and ordered her to pay the attorney fees Kyle

29

incurred in preparing the petition. The court also continued to restrict Logan's presence during Brittany's parenting time with R.W.

¶ 72 On February 18, 2022, the court issued the final judgment of dissolution. Therein, the court denied maintenance to Brittany. The court indicated that it had considered the factors set forth in section 504 and section 510 of the Act, and denied Brittany's request for a term of maintenance.

¶ 73 Section 504(a) provides that the trial court may grant maintenance to either spouse in the amounts and for the periods of time that the court deems just, without regard to marital misconduct. 750 ILCS 5/504(a) (West 2020). Section 504(a) further provides that the court shall make a finding as to whether maintenance is appropriate after considering all relevant factors. 750 ILCS 5/504(a) (West 2020). The factors include:

(1) the income and property of each party, including marital property apportioned and nonmarital property assigned to the party seeking maintenance as well as all financial obligations imposed on the parties as a result of the dissolution of marriage;

(2) the needs of each party;

(3) the realistic present and future earning capacity of each party;

(4) any impairment of the present and future earning capacity of the party seeking maintenance due to that party devoting time to domestic duties or having forgone or delayed education, training, employment, or career opportunities due to the marriage;

30

(5) any impairment of the realistic present or future earning capacity of the party against whom maintenance is sought;

(6) the time necessary to enable the party seeking maintenance to acquire appropriate education, training, and employment, and whether that party is able to support himself or herself through appropriate employment;

(6.1) the effect of any parental responsibility arrangements and its effect on a party's ability to seek or maintain employment;

(7) the standard of living established during the marriage;

(8) the duration of the marriage;

(9) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and the needs of each of the parties;

(10) all sources of public and private income including, without limitation, disability and retirement income;

(11) the tax consequences to each party;

(12) contributions and services by the party seeking maintenance to the education, training, career or career potential, or license of the other spouse;

(13) any valid agreement of the parties; and

(14) any other factor that the court expressly finds to be just and equitable.

750 ILCS 5/504(a) (West 2020).

¶ 74 A review of the final judgment indicates that the trial court's decision to deny maintenance was primarily based upon its finding that Brittany and Logan had entered into

31

a *de facto* marriage on or after December 23, 2021. In the judgment, the court included little discussion of factors, such as the actual needs of the parties; the realistic present and future earning capacity of each party; and the standard of living that had been established during the marriage. The court found that Brittany had been awarded more than half of the marital assets, that the marriage was seven years in duration, that Brittany was young, that Brittany had worked as a licensed hair stylist prior to the marriage, and that she kept her license and "could employ herself similarly with little hardship." The court further found that there was little evidence that Logan was employed, and concluded that he could fulfill childcare responsibilities while Brittany worked. In the final judgment, Brittany was awarded her nonmarital financial account of $20,000; the sum of $6365, representing one-half of Kyle's retirement account; and the 2016 Range Rover. While Brittany was awarded approximately $32,000 in equity in the marital residence, she was also assigned a debt of approximately $42,000 on the Range Rover.

¶ 75    The testimony was uncontroverted that Brittany and Kyle had enjoyed a high standard of living during the seven-year marriage. Kyle worked as a coal miner. His annual salary was approximately $127,000. Brittany was not employed outside of the home during the marriage, because Kyle wanted her to stay at home with their child. Yet, there is no indication that the trial court considered Brittany's minimal wage-earning potential in comparison to Kyle's annual income. Instead, the trial court described a scenario under which it might be possible for Brittany to work, once employed.

¶ 76    In a temporary order entered April 22, 2021, the trial court had awarded $2129.56 per month to Brittany as temporary maintenance. At that time, the court, using the income

allocation suggested by Kyle's counsel, found that Brittany could earn $19,811 annually.[2]

In the final judgment, entered February 18, 2022, the court denied Brittany any maintenance, even though there was no evidence regarding the prospects of Brittany's employability or her ability to work while caring for R.W. and a new baby. In addition, the trial court did not award Brittany the marital residence, thus requiring her to quickly find new housing suitable for herself, R.W., and the new baby.

¶ 77    In light of the foregoing, I find that Brittany should have been awarded some maintenance pursuant to section 504(a) and (b-1)(1)(a) of the Act. 750 ILCS 5/504(a), (b-1)(1)(a) (West 2020). The duration of the maintenance award is calculated by multiplying the length of the marriage by a statutory factor. 750 ILCS 5/504(b-1)(1)(B) (West 2020). Where a marriage is 7 years or more, but less than 8 years, the statutory factor is .32. Using the mathematical formula set forth in the statute, it would have been appropriate to award Brittany maintenance for two years and three months. An award of maintenance would have given Brittany an opportunity to "get on her feet," find suitable housing, and prepare for reentry into the workplace. During the trial, Brittany had expressed a desire to enroll in a two-year program at a junior college to complete her education. A term of maintenance would have allowed Brittany an opportunity time to complete the two-year program at the junior college and potentially secure better employment. Yet, the trial court gave no

---

[2]During a hearing on temporary matters, the parties argued the issue of imputed income. Kyle's attorney calculated Brittany's imputed annual income as $11 per hour over an annual work year of 1801 hours, or $19,811. Brittany's counsel relied on 750 ILCS 5/505(a)(3.2) to impute an income of $9750 to Brittany. The trial court accepted the amount calculated by Kyle's counsel.

consideration to this factor. After reviewing this record, I find that the trial court's failure to consider the economic factors set forth in 504(a) was an abuse of discretion.

¶ 78　As noted above, the trial court's decision to deny maintenance was primarily based upon a finding that Brittany and Logan had entered into a *de facto* marriage as of December 23, 2021. Section 510(c) of the Act provides that the obligation to pay future maintenance will be terminated if the party receiving maintenance "cohabits with another person on a resident, continuing conjugal basis." 750 ILCS 5/510(c) (West 2020). The obligation to pay maintenance terminates on the date the court finds that cohabitation began. 750 ILCS 5/510(c) (West 2020). "[T]he rationale behind termination of maintenance when resident, continuing, conjugal cohabitation exists is [to prevent] the inequity created when the ex-spouse receiving maintenance becomes involved in a husband-and-wife relationship but does not legally formalize it, with the result that he or she can continue to receive maintenance." (Internal quotation marks omitted.) *In re Marriage of Miller*, 2015 IL App (2d) 140530, ¶ 40.

¶ 79　Factors that the court considers in determining whether a *de facto* husband-and-wife relationship exists include: (1) the length of the relationship, (2) the amount of time the couple spends together, (3) the nature of the activities they engaged in, (4) the interrelation of their personal affairs, (5) whether they vacation together, and (6) whether they spend holidays together. *In re Marriage of Herrin*, 262 Ill. App. 3d 573, 577 (1994). In determining whether the petitioner has met his burden, the court considers the totality of the circumstances. *Miller*, 2015 IL App (2d) 140530, ¶ 40.

34

¶ 80 During the trial on November 2, 2021, the parties presented evidence on Kyle's motion to terminate maintenance. Kyle alleged that Brittany and Logan had been cohabiting "on a resident, continuing conjugal basis." At the close of the evidence, the court took this matter under advisement.

¶ 81 In the final judgment, the trial court denied Brittany maintenance, and also denied Kyle's request for reimbursement of temporary maintenance. The court found that there were certain facts regarding Brittany's relationship with Logan that were relevant to its decision, including a finding that Brittany and Logan had been engaged in a *de facto* husband-and-wife relationship.

¶ 82 The court initially found that Brittany's testimony regarding the duration of her relationship with Logan was not credible. During the hearing in April 2021, Brittany testified that she began dating Logan in January or February of 2021. After considering some text messages between Brittany and Logan, and the timeline of Brittany's pregnancy with Logan's child, the court found that Brittany had been in a relationship with Logan prior to the filing of the dissolution petition in December 2020. The court acknowledged that conceiving a child outside of the marriage was not dispositive of the maintenance issue. The court also found there was evidence that Brittany was supporting Logan. The court pointed out that Brittany admitted that Logan stayed with her one to three nights a week, when R.W. was not there. The court further found that Logan was not contributing to the household financially and did not have a job besides a "side thing with InstaCart." After reviewing this evidence, the court concluded that Kyle did not present sufficient evidence to prove the existence of the *de facto* marital relationship prior to December 23, 2021.

35

¶ 83    I agree with the trial court's conclusion. The evidence offered during evidentiary hearing on November 2 was insufficient to prove the existence of a *de facto* marital relationship prior to December 23, 2021. The court, however, went on to take judicial notice of events that occurred after the evidentiary hearing to find that Brittany and Logan were engaged in a *de facto* marriage after December 23, 2021. This was error.

¶ 84    In the final judgment, the court, on its own motion, took judicial notice of the undated letter attached to Brittany's supplemental response to the show cause order. The court quoted from this letter, noting that Brittany stated that she and Logan "followed through with the order [prohibiting Logan from being around the minor child] from April til December 23rd when we brought our daughter home from the hospital and he stayed to help me." The court further noted that Brittany wrote, "Logan and I want to move on with our future ... That's all we want, is to move forward & be happy."

¶ 85    In my view, the trial court should not have considered the information in Brittany's letter to determine whether Brittany and Kyle were engaged in a *de facto* marriage. The letter was attached in support of Brittany's response to the show cause petition, and, if relevant at all, was offered in response to Kyle's petition for rule to show cause. The letter was submitted after the proofs were closed, and it described events that occurred after the trial. Furthermore, this was a two-page, single-spaced letter, that rambled, requiring the reader to interpret Brittany's writings and the meaning of her statements. Given that, it is difficult to find true admissions in the letter. Furthermore, the letter offers no indication as to whether Logan stayed with Brittany after her medical restrictions were lifted. It was unfair to consider an extraneous document that was not the subject of the hearing on

36

November 2 as evidence that Brittany and Logan had been in a *de facto* marital relationship as of December 23, 2021, the date Brittany came home from the hospital.

¶ 86    The court also took judicial notice, again on its own motion, of an unrelated proceeding on February 8, 2022, in which Logan listed his address as "the parties' marital residence." Again, this occurred after proofs were closed. Moreover, the circumstances that gave rise to this action were not before the trial court.

¶ 87    Rule 201 of the Illinois Rules of Evidence (eff. Jan. 1, 2011) permits the court to *sua sponte take judicial notice of adjudicative facts at any* stage of the proceedings. A fact subject to judicial notice "must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Ill. R. Evid. 201(b) (eff. Jan. 1, 2011). The rule allows for judicial notice without prior notice to the parties, but also provides that a party has a right to be heard on the propriety of taking judicial notice. Ill. R. Evid. 201 (eff. Jan. 1, 2011). The opportunity to be heard encompasses notions of fair play and allows all parties a fair opportunity to rebut any evidence that might be damaging to their position. *People v. Barham*, 337 Ill. App. 3d 1121, 1129 (2003).

¶ 88    Here, the trial court took judicial notice in the final judgment, without any notice to the parties. Neither party had an opportunity to address whether the information relied upon by the trial court constituted proper adjudicative facts for judicial notice, nor to rebut or explain the "judicially noticed" evidence. In my view, the court could have re-opened the proofs, or allowed some briefing on these new matters. Here, the parties had no opportunity

37

to be heard on a critical issue in the case. As such, I find that the court erred in taking judicial notice of these matters.

¶ 89 When the trial court weighed the factors to determine whether a *de facto* husband-and-wife relationship existed based on the evidence provided during trial on November 2, 2021, the court found that Kyle was unable to prove that Brittany and Logan were cohabitating before December 23, 2021. There was no evidence that Brittany and Logan were living as a husband and wife would live. They maintained separate residences. Logan did not have a key for Brittany's residence. He did not keep personal possessions at Brittany's home. He also did not receive mail at Brittany's residence. Logan did not contribute to Brittany's utility bills or household expenses. There was no evidence that Logan and Brittany shared a bank account, assets, or finances. Contrary to the trial court's finding that Brittany was supporting Logan, the evidence at trial revealed that Brittany was unemployed. And, providing Logan with a place to stay a few nights per week and a few meals does not constitute a commitment to provide Logan with financial support on a permanent basis. Finally, it is noteworthy that Logan did not testify during the November 2, 2021, trial, and his intentions with respect to Brittany and the new baby were unknown. Thus, while Brittany may have wished for a mutual, committed relationship with Logan, it is not clear that this was reciprocal. The totality of the evidence at trial established that Logan and Brittany shared an intimate dating relationship, and had a child together. But there was no evidence that they intended to live as committed partners. See *Miller*, 2015 IL App (2d) 140530. The trial court's determination that a continuous conjugal relationship began after December 23, 2021, was against the manifest weight of the evidence.

38

¶ 90　For these reasons, I find that the trial court erred in denying an award of maintenance to Brittany, based upon an erroneous finding that Brittany and Logan were engaged in a *de facto* husband-and-wife relationship. I would reverse the trial court's denial of maintenance and remand for a new hearing on the issue of maintenance. In all other respects, I concur in the majority's order. Accordingly, I concur in part and dissent in part.